In the Matter of the Adoption of WILLIAM RUSSELL DAVIS.

Surrogate's Court, Kings County, February 15, 1932.

*Bond & Strouss*, for the petitioners Frank Joseph Hoffman and Louise Estelle Hoffman.

*Morris Kaplan*, for the respondents Margaret and William Stinson.

*Frederick A. Keck*, special guardian.

WINGATE, S. From the viewpoint of this often crassly materialistic age, the present case might be considered of negligible importance for its determination will not result in the gain or loss of a single dollar. In its human aspect, however, it possesses transcendent interest, since it is a battle for a life with grim reality equal to any frankly capital case in the criminal annals of the State. In final result, the question which this court is called upon to decide is whether existing rules of law compel a direction that a delicate boy of eight years, who, for all but two months of his life, has enjoyed every advantage of a loving and well-to-do home, shall be wrested from these beneficial and attractive surroundings and condemned to a life of privation and penury, infinitely worse than death, under the domination of a scoundrel so dastardly that any restrained characterization of his conduct would be as impossible as it is inappropriate.

Before entering upon a consideration of the controversial features of the evidence which has been adduced, the facts about which no issue exists must be rehearsed, unpleasant as such a task may be.

Margaret O'Donnell was born in 1896 or 1897. Nothing is disclosed concerning her parents or early home. In 1906 she was an inmate of an orphanage in Hoboken where she remained until 1912. Her schooling was most meagre, not continuing beyond the third grade of grammar school. She was put to work as a kitchen drudge at which occupation she was kept until she reached the age of fifteen or sixteen. A woman, variously called Mrs. Decker (S. M. p. 58) and Miss Stinson (S. M. p. 104), then took her from the asylum. The pretext for this removal appears to have been charitable, but the result was far different. With slight delay she was seduced by the married brother of the supposed good samaritan who was separated from a nebulous sister of his victim. Five children were the result of this illicit union, the first, Joseph, being born on March 31, 1913, and the last, Russell, the child here in question, on May 4, 1923. The life of the couple appears to have been a stormy one, their chief difficulties centering about the subject of a marriage between them. It seems unquestionable that at the start, at least, such a marriage could not have been solemnized without involving this man, William Stinson, in the possibility of a prosecution for bigamy. Whether or not this disability was ultimately removed is a subject on which the record fails to satisfy the court, but the question is presently immaterial. Suffice it to note that the girl finally carried her point, and the couple was married in New York city on June 20, 1923. The marriage license was obtained on a sworn application in which substantially all of the man's statements were admittedly perjured. Almost immedi-

ately after the ceremony he decamped leaving the woman to struggle along with the five children, the oldest of which was ten years, and the youngest, scarcely two months old. Concerning their situation at this time the eldest daughter testified (S. M. p. 111): " we had nothing in the house. My mother was sick at that time." The deserting husband and father left the sick woman and the five small children utterly without any means of support and contributed nothing toward their maintenance from the time of his departure in June or early July, 1923, until his return, late in 1924. Penniless and ill, overwhelmed by her troubles and the responsibility of the five children, all of whom were too young to work, the deserted mother inserted an advertisement in a New York newspaper reading " *Nice Baby Boy* given for adoption to Catholic family. L. 503 World."

This advertisement was answered by a Mrs. Florence Davis, a middle-aged woman with grown children of her own, living in Brooklyn. In reply, the mother wrote a letter which has been introduced in evidence as petitioner's Exhibit 6. This reads in part as follows: " I got your letter about my baby I would be glad to go over to yow but I have no money to go with I would be afraid to take a tax because you may not whant to pay for it so what wood I do, why dont yow come yourself, to my home then if yow like the baby yow can take him * * * if yow can come now all right as I ecpest an other lady to come she sent me a telegram an is grazie to get the baby."

Petitioner's Exhibit 7, also in the mother's handwriting, and admittedly sent by her, after arranging to call on the following Thursday, reads in part: " The baby is on the bottle and no trouble a real good baby. I am a poor woman with four other children and I cannot keep him I have all I can do to get a long. I am willing to sine him over to yow he a nice baby and I no yow will like him."

The mother thereupon took the child to Brooklyn and turned it over to Mrs. Davis who paid her twenty dollars.

The child was in delicate health, as indeed, Mrs. Stinson stated all her children were, and in 1927 Mrs. Davis took it to Florida, where she died in October, 1928. On her deathbed she expressed the wish that the little boy should be legally adopted by her married son and his wife, the petitioners in this proceeding, and this was accomplished by order of this court dated November 20, 1929. This was done without notice to the natural parents who were alleged to be unknown to the adoptive parents and to have abandoned the infant.

As ascertained by the court from the testimony in this case

and the report of its special investigator at the time of the adoption, the adoptive parents are childless and have ample means to give the child good care, attendance and education. They reside in a nicely-furnished and well-kept apartment of . eight rooms and bath at 1766 West Eighth street, Brooklyn. The adoptive father is in business for himself and enjoys a good income.

The natural father, William Stinson, returned from his wanderings in the latter part of 1924, and, according to the testimony, has not again abandoned his family. The second son, William, has died, and another daughter, Catherine, was born on February 16, 1925. Stinson is a produce peddler and claims to earn under favorable conditions from twenty-five to thirty dollars a week. He has, however, had several periods of sickness, which have confined him for two to three months at a time in various hospitals. Aside from this rather precarious livelihood, the only support of the family, consisting of the man, the woman and four children, comes from the earnings of the eldest daughter, now seventeen years of age, who is a pieceworker in a can factory and is said, under favorable conditions, to be capable of earning from eighteen dollars to nineteen dollars a week.

The family lives in an eight-family frame tenement in Hoboken, their flat consisting of a kitchen, living room and two bedrooms, the latter having no outside windows. There is no bath in the building and the only toilet facilities are in the hall. Heat is supplied by a kitchen stove and a heater in another room. The rental is twenty-two dollars a month. It takes all the money which can be raised to support the family (S. M. p. 88) and they have never been able to save anything. None of the children have ever received any schooling beyond the legally required minimum and have been put to work at the earliest possible time. The father is substantially illiterate.

It was admitted that if the boy in controversy should be given them, the present living accommodations would be inadequate and another room would have to be obtained. How it was hoped to finance this additional expense and to feed another mouth was not explained except by the statement that the welfare workers might help. Questioned on the subject of possession of means for the education of the boy, the reply was (S. M. p. 87): " Maybe when he grows that big, maybe I would have." In view of the precarious condition of Stinson's income and health and the fact that he is apparently already well beyond middle age, this anticipation appears wholly without foundation, especially when it is recalled that the only way the family can presently subsist is by the contribution of the earnings of the seventeen-year old daughter who can hardly

be expected to continue the role of breadwinner of the family much longer, even if her apparently delicate health would permit.

On August 6, 1930, the mother went to Brooklyn and attempted to seize the child, who was playing in front of the home of the adoptive parents. She was restrained from so doing. The present proceeding for confirmation of the adoption and the counterclaim of the natural parents for the custody of the child was then instituted.

All of the foregoing facts are uncontroverted, but a conflict of testimony developed on the hearing in regard to certain other features of the case which, while relatively unimportant in the opinion of the court, deserve comment.

Mrs. Stinson testified that, upon the return of her husband in 1924, he was very angry at her surrender of the child, and a letter seems to have been written at his direction looking to a return of the boy, to which Mrs. Davis replied that she would consent to his return on condition that the expenses to which she had been put in connection with his care, and the money which she had paid Mrs. Stinson, was returned. This was admittedly never done.

Mrs. Stinson testified that she had made almost weekly trips to see the boy from the time she surrendered him to Mrs. Davis, and her husband and eldest daughter gave partly corroborating testimony to this effect. This was not controverted by any direct evidence on the record and could not be, as Mrs. Stinson fully realized (S. M. p. 83), in consequence of the death of Mrs. Davis. It is a somewhat significant fact in this connection, however, that neither Mrs. Davis' husband, nor her son or daughter-in-law, who were with her almost daily, ever saw the Stinsons on any of these alleged visits.

In the opinion of the court, based on the demeanor of the witnesses and their manner of testifying as well as on the admitted perjury of Mr. and Mrs. Stinson, neither their testimony nor that of their daughter is worthy of the slightest credence. Stinson was forced into admissions that his deliberate sworn statements in applying for a marriage license were perjured. He is an admitted adulterer and seducer of an immature orphan girl. He demonstrated his utter insensibility to the ordinary dictates of decency or obligation by abandoning his wife and five small children in a state of utter destitution. There is more than a suspicion on the record that he committed statutory rape and bigamy, and, as will be noted at greater length hereafter, his actions in connection with this proceeding savor strongly of semi-blackmail.

After having stated categorically to this court that she could

neither read nor write, Mrs. Stinson admitted the authorship of the letters signed by her which were introduced in evidence as petitioner's Exhibits 6, 7 and 8.

Margaret, her daughter, on direct examination, told a story corresponding in minute particulars and verbiage to that of her parents, and yet categorically swore that this critically controversial case had never been talked about by her at home and that she had never discussed it with respondents' attorney. (S. M. pp. 121, 122.)

As to the testimony of all three of these persons, therefore, the principle *falsus in uno, falsus in omnibus* applies. (*Moett* v. *People*, 85 N. Y. 373, 377; *Deering* v. *Metcalf*, 74 id. 501, 506, 507.)

The remaining pertinent facts concern the occurrences on August 6, 1930, when Mrs. Stinson attempted to kidnap the child. Six witnesses testified on this subject, Mrs. Stinson and her daughter Margaret, on behalf of the respondents, and the adoptive mother, her mother and two friends who were visiting in the house, on behalf of the petitioners. The latter two are in no way related to the litigants and have no conceivable interest in the controversy. The testimony of the two sets of witnesses was directly conflicting. The court credits the testimony on behalf of petitioners both in consequence of the apparent truthfulness of their witnesses and the absence of any motive for falsification, while, as noted, it deems the respondents' witnesses utterly untrustworthy. The facts of the conversation then had, as proved to the satisfaction of the court, are that Mrs. Stinson then stated that she had not seen the child for seven years (S. M. pp. 18, 28); that she did not wish to take him back as she could not support him (S. M. pp. 17, 28, 32), but that he was now old enough to help his father on his peddler's cart (S. M. p. 32) and that the latter wanted him and continually beat her (S. M. pp. 17, 28). She also suggested that the adoptive parents should see her husband and " make some arrangement with " him in respect to the child (S. M. p. 39).

As a result of the weighing of the testimony, the court determines that the pertinent facts are as follows: The infant in question was born on May 4, 1923. His parents were William Stinson and Margaret O'Donnell, who at the time of his birth were unmarried, but who subsequently intermarried on June 20, 1923. On or about July 1, 1923, William Stinson abandoned his wife and said child and left them wholly without support. During the continuance of this abandonment, and in or about the last week of July, 1923, the mother, Margaret O'Donnell Stinson, delivered and surrendered the child to Mrs. Florence Davis, in return for a monetary consideration. In or about the month of December, 1924, the respond-

ents communicated with Mrs. Davis on the subject of a return of the child and the latter stated that she would accede to such return upon receipt of the moneys which she had paid Mrs. Stinson and which she had expended for the child. Neither such moneys nor any part thereof were either paid or tendered. Neither of the respondents visited nor attempted to visit or see the child between the summer of 1923 and the 6th day of August, 1930. Florence Davis properly and generously cared for the child until the time of her death in October, 1928. Pursuant to the dying request of Florence Davis, the petitioners assumed the custody of the child and ever since have and now are properly and generously caring for him. On November 20, 1929, by order of this court, the said petitioners legally adopted said infant. On August 6, 1930, Margaret Stinson attempted to kidnap said infant, being forced to said action by the threats and mistreatment of said William Stinson. The respondents are not in such financial circumstances as to enable them properly to care for and rear said infant.

The sole reasons actuating the attempt of the respondents to secure possession of said infant are to extort moneys from the petitioners or to exploit the infant for their personal gain. Petitioners are well able and desire to properly care for and rear said infant. The physical, moral and educational interests of the infant will be advanced by his remaining in the custody of the petitioners.

The prayer of the petition is that the aforesaid adoption be confirmed. The cross-relief demanded by the respondents seeks the abrogation of the adoption and the delivery of the custody of the child. Both sides invoke the equitable powers of the court.

Two questions are presented for consideration by these pleadings. The first concerns the custody of the infant. The second relates to the propriety of the order of adoption. The determination of both is free from difficulty on the facts as found.

The infant is in the custody of the petitioners. To warrant an order removing the child therefrom and awarding it to the respondents, there is one and only one consideration of importance, *namely,* the welfare of the child. The principle has been repeatedly enunciated. In *People ex rel. Dunlap* v. *New York Juvenile Asylum* (58 App. Div. 133) the court says (at p. 135): " But, after all, the question in this case does not depend upon the absolute legal right of the parent to the custody of the child, but the important thing to be determined in any such case is the interest of the child itself. If it appears that the mother, either because of her poverty or for any good reason, is not a proper person to be intrusted with the custody of the young person, the courts will refuse it. It does

not appear in this case whether the father of the child is living or not. It does appear, however, that the mother was in 1894 in such destitute circumstances that she gave up the control of the child because she was not able to care for or support it. Before the court should deliver the child it is its duty to ascertain whether the mother is the one entitled to its custody, and if so, whether her circumstances are so changed that she is in a condition to support and sustain her child. The custody of the child is not to be returned to her solely because of her legal right, to the end that she may have the benefit of its labor and be supported by it, but whether the court will deliver the child is a matter within its sound discretion upon the facts made to appear."

*Matter of Meyer* (156 App. Div. 174; appeal dismissed, 209 N. Y. 59) contributes the following, with an abundance of cited authority (at p. 176): " It is now too well settled to require fortification by extended citations from cases that, in determining to whom the custody of an infant of tender years shall be confided, the paramount and controlling consideration is the welfare of the infant. To this all other considerations must be subordinated including the wishes of the parents, or, as in this case, the surviving parent. Of course a father or a mother has a strong natural claim to the custody and companionship of a child, but even this must give way where it clearly appears that the child's welfare requires different disposition of its custody." To like effect see *Matter of Lee* (220 N. Y. 532, 539); *People ex rel. Pruyne* v. *Walts* (122 id. 238, 242).

There can be no possibility of diverse views in this case respecting the course which is dictated by the best interests and welfare of the child. Any statement in this regard in addition to the observations which have already been made would be redundant in the extreme. Under no conceivable circumstances would this court consider awarding the child to the respondents.

Approaching the question of the adoption, this is a matter which is wholly regulated by statuté and was unknown to the common law. (*Matter of Thorne*, 155 N. Y. 140, 143; *Matter of MacRae*, 189 id. 142, 143; *Matter of Ziegler*, 82 Misc. 346, 350; affd., 161 App. Div. 589.) The enactment presently in force is contained in chapter 19 of the Laws of 1909, as amended, which is now a part of the Domestic Relations Law. The only portion of the statute which is presently material is that part of section 111 (as amd. by Laws of 1924, chap. 323) which reads as follows: " *Whose* consent necessary.— Consent to adoption is necessary as follows: \* \* \*

" 3. Of the parents or surviving parent of a legitimate child, and of the mother of an illegitimate child, but the con-

sent of a parent who has abandoned the child, * * * is unnecessary; * * *."

Sections 112 and 113, as amended,* provide in part that all persons whose consent to the adoption is required shall appear before the surrogate, who if satisfied that the moral and temporal interests of the person to be adopted will be promoted thereby " must make an order allowing and confirming such adoption."

The effect of an order of adoption without notice to a natural parent and based on allegations of abandonment, is clearly stated in *People ex rel. Pickle* v. *Pickle* (215 App. Div. 38, at p. 44) as follows: " The statute relating to the adoption of children provides that the consent of a parent who has abandoned the child is unnecessary. * * * The statute contains no express provision requiring notice to a parent that he or she may be heard on the question of abandonment. Without such notice, however, either actual or constructive, an adjudication cannot be made that will be conclusive on the parent on that issue. * * * Somewhere, either in the Surrogate's Court, or in some proceeding like the one now before the court, Mabel Pickle is entitled to attack the finding of abandonment made in the adoption proceeding. We will assume that she has the right to raise that question in this proceeding. The order of adoption, however, is not void or voidable because of her right to attack it, but is valid unless the finding of abandonment was erroneously made."

The natural parents are entitled to their day in court on the issue of whether or not the jurisdictional allegation of abandonment was true. This right has been held to exist under the Fourteenth Amendment to the Constitution of the United States (*Schiltz* v. *Roenitz*, 86 Wis. 31; cited with approval in *Matter of Livingston*, 151 App. Div. 1, 5).

The situation is succinctly stated in *Matter of Johnston* (76 Misc. 374, at p. 376): " To confer jurisdiction upon the surrogate to make the order confirming such adoption, it was necessary to obtain the father's consent or the *fact* of abandonment must exist."

A determination of the question can be brought on in many ways. The commonest method is by a habeas corpus proceeding (*Matter of Livingston*, 151 App. Div. 1; *People ex rel. Lentino* v. *Feser*, 195 id. 90; *People ex rel. Cornelius* v. *Cullen*, 69 Misc. 187; *Matter of Larson*, 31 Hun, 539; revd., on other grounds, 96 N. Y. 381), but it has also been adjudicated in a proceeding to abrogate an adoption (*Matter of Moore*, 72 Misc. 644; *Matter of Johnston*, 76

---

* See Laws of 1922, chap. 607, and Laws of 1924, chap. 323.— [REP.

id. 374; *Matter of Hayford,* 109 id. 480) and on an issue of status on the probate of a will (*Matter of Dein,* 135 Misc. 244). It may, and of course frequently is, made an issue on the initial application for allowance of the adoption (*Matter of Miller,* 119 Misc. 638). The proceeding instituted by petitioners is entirely appropriate for the purpose, and is analogous to an application for the reprobate of a will where a potentially interested person has not been cited in the first instance. Not only is the jurisdiction of the court clear from this aspect of the question, but the answer of respondents invokes the affirmative relief of abrogation.

The sole question for decision, therefore, is as to whether the finding of the court made *ex parte* in the original proceeding, that the natural parents had abandoned the child was correct. If so, under the terms of the statute, their consents were unnecessary, the original order was correctly made and all rights of the respondents were and are completely and permanently cut off.

No definition of " abandonment " is given in the statute, but the meaning of the term has often been stated. The Standard Dictionary [1930 ed.] defines " abandon " as " To forsake or renounce utterly; to give up wholly; desert. To give over entirely to another; resign; yield."

In *Pidge* v. *Pidge* (44 Mass. [3 Metc.] 257, 265) the following is found: " To abandon is totally to withdraw ourselves from an object; to lay aside all care for it; to leave it altogether to itself."

In construing an adoption statute whose terms were substantially identical with those of that of this State, the Supreme Court of Wisconsin said in *Parsons* v. *Parsons* (101 Wis. 76, 79): " The term ' abandon ' obviously means no more than neglect or refusal to perform the natural and legal obligations of care and support which parents owe to their children."

Similar definitions may be found in *Sharkey* v. *Candiani* (48 Ore. 112; 85 Pac. 219, 224); *Hough* v. *Brown* (104 Mich. 109; 62 N. W. 143, 144); *Merchants' Nat. Bank* v. *Greenhood* (16 Mont. 395; 41 Pac. 250, 266) and many other cases.

While the results of all adjudications on the subject in this State demonstrate the adoption of a like interpretation of the term by New York courts, only two cases have been found in which definitions have been attempted. Both were decided by Surrogate SLATER of Westchester county. The first is in *Matter of Hayford* (109 Misc. 479, at p. 481) and reads as follows: " The term ' abandonment ' means neglect and refusal to perform the natural and legal obligations of care and support. If a parent withholds his presence, his love, his care, the opportunity to display filial affection and neglects to lend support and maintenance,

such a parent relinquishes all parental claim, and abandons the child." The second is substantially identical and is given in *Matter of Dein* (135 Misc. 244, at p. 246).

It is obvious that prior to the date of the original order of adoption in this case, both of these natural parents had abandoned the child within these definitions. The father had absconded leaving it in an entirely destitute condition and from the time it was two months old had never in the slightest contributed to its support. The mother had surrendered it to alien hands, and for approximately seven years had left its support and maintenance to others and had, during the interval, wholly withheld her presence, love and care. This statement is made merely as one of fact and in no sense as a criticism of her act in this regard, since she unquestionably realized that such a course was for the child's best interests. It was an act of mother love in the highest and best sense, as it subordinated her natural instincts to the higher dictates of the welfare of the infant. The fact, and the only pertinent fact in this connection, however, was that this action on her part, under the terms of the statute, obviated the necessity of securing her consent to the adoption.

Some question was made on the hearing as to whether the abandonments by the natural parents were continuing acts. If an " abandonment " signifies a neglect to perform the natural and legal obligations of care and support, such abandonment obviously continues until the situation is reversed, and such care and support are resumed. At the time the order of adoption in this case was made, not only had this not been done, but no effort so much as to see the child had been made for over five years. Obviously, therefore, the allegation and finding of abandonment at the time were one of a true presently existing fact, wherefore the order of adoption was within the jurisdiction of the court under the terms of the statute.

Adjudications on this subject are comparatively few in number, but two authorities particularly pertinent on both the facts and law are *People ex rel. Lentino* v. *Feser* (195 App. Div. 90) and *Winans* v. *Luppie* (47 N. J. Eq. 302). In the latter case the court makes the following apposite observations (at p. 304) : " The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion

to decide whether another may assume these claims and duties, than does the signature of the parent, which a mere impulse may induce. It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust, that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parent were concerned."

The court, therefore, determines that on November 20, 1929, the respondents had as a matter of fact abandoned the infant in question, and that such abandonment was an existing fact at such time, wherefore the consent of the respondents to the adoption was unnecessary and the order of this court confirming the adoption by petitioners was in all respects valid and binding upon them.

An order may be entered comformable to petitioners' prayer for relief. In view of respondents' attempt to take the law into their own hands, such order may also provide a direction restraining the respondents, their agents and representatives from in any manner interfering with the infant or the petitioners' custody of him. Proceed accordingly.