In the Matter of the Adoption of GLORIA CHRISTINA BRODERICK, an Infant under Twelve Years of Age, by A. CHARLES THOMAS and CHRISTINA M. THOMAS.

Children's Court, Westchester County, November 11, 1932.

*C. W. Ticknor,* for the petitioners.

*Julius Hockstein,* for child's natural father.

SMYTH, J. A. Charles Thomas and Christina M. Thomas, his wife, desire to adopt the child of the latter's deceased sister, without the consent of its father, contending that such consent is unnecessary

because of his alleged abandonment of the child. (Dom. Rel. Law, § 111.) He appears by his attorney and opposes the application. The statute provides not only for dispensing with the consent of such parent, but requires no notice to him of the application.

No determination of the matter which would be conclusive against him may be made, however, without such notice and an opportunity to be heard. (*People ex rel. Pickle* v. *Pickle*, 215 App. Div. 38.) Objection may be made by the parent on the original hearing or subsequently by habeas corpus, or in a petition to confirm or set aside the decree. (*Matter of Davis*, 142 Misc. 681.)

Adoption was unknown to the common law. It is the creation of the Legislature and must be governed strictly by the statutory provisions. (*Matter of Buss*, 234 App. Div. 299; *Matter of Davis*, *supra*.) The important question to be determined, therefore, is, does the evidence establish an abandonment of the child within the meaning of the statute? If that question be answered in the affirmative, further inquiry should be made as to whether the best interests of the child will be promoted by approving the application.

To frame a precise definition of the term " abandonment " would be rather difficult. In *Matter of Bistany* (209 App. Div. 286; affd., 239 N. Y. 19) the Appellate Division said: " Without attempting, therefore, to define sharply what constitutes abandonment under subdivision 3 of section 111 of the Domestic Relations Law (as amd. *supra*), we think, inasmuch as the fact seems to be intended as a substitute for consent, that the evidence should at least warrant an inference that the parents, at some point of time, definitely dropped their parental interests, duties and obligations. The question is one of fact, and, so strong are the ties of nature, the courts tend to exact a considerable degree of clearness and certainty in the proof of the renunciation."

In *Matter of Hayford* (109 Misc. 479) Surrogate SLATER said: " The term ' abandonment ' means neglect and refusal to perform the natural and legal obligations of care and support. If a parent withholds his presence, his love, his care, the opportunity to display filial affection, and neglects to lend support and maintenance, such a parent relinquishes all parental claim, and abandons the child."

In *Winans* v. *Luppie* (47 N. J. Eq. 302) the court said: " It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child," and further justified the position of the State under a statute dispensing with parental consent in the following language: " Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another

may assume these claims and duties, than does the signature of the parent, which a mere impulse may induce."

It will be helpful now to consider what circumstances have been held sufficient to constitute abandonment. In *People ex rel. Pickle* v. *Pickle (supra)* the child's mother disappeared on August 24, 1920, leaving him with his paternal grandparents, knowing that the child would be well cared for. Without reviewing the facts in detail, suffice it to say that the mother showed some slight concern for the child in letters, but contributed nothing of her presence, love or affection and reappeared on June 29, 1925, to reclaim, through habeas corpus, her child, who had been adopted December 14, 1920. The court held: " In our opinion, however, the finding of abandonment *before* December 14, 1920, was not erroneous."

In *People ex rel. Lentino* v. *Feser* (195 App. Div. 90) the child was born July 1, 1915. On October 2, 1918, the mother placed the child under the care of respondent who adopted it, without the consent of the mother, on September 23, 1919. On March 15, 1920, the mother sued out a writ of habeas corpus. Held, that the relator had abandoned the child prior to the making of the adoption order, and that the writ should be dismissed.

While the determination that abandonment had occurred prior to a certain date was made easier in both the foregoing cases by the fact that it had continued for some time thereafter before being brought up for review, it is important to note that in each case the court declared that the abandonment became complete after a comparatively brief interval had elapsed between the alleged abandonment and the adoption, and that in the one case the decision was reviewed about four years and ten months, and in the other about one year and six months after the abandonment.

Now let us consider the instant case, in the light of the foregoing definitions and decided cases.

Katherine Wilson and Vincent B. Broderick married in 1921. They lived in Mount Kisco practically all of their married life up to 1927. Misunderstandings had arisen between them prior to the birth of their child on March 19, 1927.

From January to March, 1928, Broderick was in the county jail in Rockland county, having been convicted of petit larceny. During that time his wife and child were in want and dependent upon the wife's mother. When he was released from jail, they patched up their differences and resumed living together as man and wife, in an apartment over that occupied by Mrs. Wilson, the mother of Mrs. Broderick. Between March and September, 1928, their quarrels were resumed or continued. According to the version of Mrs. Thomas and Mrs. Wilson, the cause of the quarrels was

cruelty and neglect, whereas, according to Broderick, the cause was the wife's interests outside her home, for which he upbraided her. However that may be, in September, 1928, she left him, taking with her only the baby's crib and a few articles of clothing, and went downstairs with the baby to live with her mother. Again there is a dispute as to the immediate cause of the parting. The petitioners claim that it was due to Broderick's cruelty, and that the rent was unpaid, whereas he claims that she left following a violent quarrel regarding her conduct. Broderick continued to occupy the upstairs apartment during the next two months, while the wife and child lived with the former's mother downstairs. During that period Broderick says he went in to see his wife several times and contributed some small sums of money to her support. His testimony in this regard is open to doubt. The only person who could directly controvert it is dead, and it is significant that the wife's relatives knew of no such contributions. (*Matter of Davis, supra.*) After the expiration of said two months' period he never saw his wife or child except perhaps on one occasion, just before the wife was taken to the hospital where she died, nor did he contribute a dollar to the support of wife or child.

He testifies that from September, 1928, to the day of the wife's death, June 15, 1930, he was living in Mount Kisco, except for one year, and that he spent part of that time at Irvington. Mrs. Thomas testified, however, that in July, 1929, he told her that he was going to California with another woman, and after that he was not in Mount Kisco for a year. Broderick, although he testified at length on the hearing, did not contradict this testimony, which is, therefore, accepted as true. Mrs. Thomas also testified that her sister, Mrs. Broderick, received a card which Broderick sent her from California stating that he had made another mistake in going away with a woman. He admits that during the period of a year and a half from January 1, 1929, to June 15, 1930, he was not in communication with his wife or child and did not contribute to their support.

Mrs. Broderick died of tuberculosis after being confined to a hospital for about three months, and during her last illness Broderick did not call to see her. She had commenced a separation suit against him based on allegations of cruelty. On her death this action abated. From the time of her death to the present date Broderick seems to have exhibited less interest in his child's welfare, if that were possible, than he showed prior to the wife's death. He has never made any attempt to see the child, to communicate with her in any way or to contribute to her support, nor has he made any inquiry concerning her welfare. On one occasion he saw the

child playing in a yard, and says he would have taken her any time his wife's relatives would have allowed him to do so. He never made a demand for her, however, and never commenced any legal proceedings to regain the custody of the child. Mrs. Thomas testified that never since the mother's death has Broderick been to see the child, and that she, Mrs. Thomas, has " never seen him until today."

Broderick is married and has resided in Katonah for the past year and a half. He occupies an apartment of six rooms with his wife and mother. He is supporting them and paying forty-five dollars rent, plus five dollars rent for the garage, making in all fifty dollars per month. He is a licensed plumber by occupation, is working at the present time and earning money; yet no proof has been adduced during this hearing to indicate the slightest interest in the welfare of his child nor the least affection for her. There is no proof of any effort or desire on his part to provide for her, nor to assume the natural duties or obligations of a parent, except the bare statement that he desires to strenuously oppose the adoption, and that he now wishes to have the custody of the child and give it shelter and maintenance.

It is difficult to imagine a clearer case of complete abandonment than the foregoing recital presents. For practically four years Broderick has completely neglected the child, and left it to the care of his wife's relatives. During this time the child must have formed ties of affection for these relatives, who appear to be people of standing in the community, well able to care for her, and actuated by the deepest love and affection for her. If the matter were to be considered solely from the standpoint of the child's welfare, there could be no question that her interests would be best served by leaving her with them, rather than by transferring her to the care and custody of a father who has so shamefully neglected her, or to his relatives who have shown not the slightest interest in her during this long period. The question should be first considered, however, from the standpoint of the father's legal rights. (*Matter of Bistany, supra.*) If he has not abandoned the child within the meaning of the statute, the court is without power to approve this adoption. If, on the other hand, his actions constitute such abandonment, he is not now in a position to successfully oppose the petition, if it shall appear to the court that the best interests of the child require that the application be granted. This, I am convinced, is the situation.

If, as intimated in the *Davis* case, an opportunity for repentance may be given in the exercise of judicial discretion, it should be

450

based upon extenuating circumstances appearing in the record. I find none in this case. The father offers no excuse or explanation for his willful neglect and abandonment of the child over a period of almost four years. In view of his past actions I cannot accept his statement of good intentions at this time (*Matter of Meyer*, 156 App. Div. 174, 179), nor can I reconcile it with my conscience to confide the child to his care. The adoption will, therefore, be approved.