In the Matter of the Adoption of Baby SMITH COHEN, Also Known as MARION SPEVACK, a Minor under the Age of Twelve Years, by HENRY C. SPEVACK and SOPHIE SPEVACK.

Surrogate's Court, Kings County, April 16, 1935.

*Moses Lakin*, for the petitioners.

*James F. Conway*, for the respondent.

WINGATE, S. Unquestionably the most difficult and perplexing problems which ever come before a court for decision are those questions which, while involving no financial consideration, have to do with those vitally important but wholly imponderable questions of human relations involving the basic sentiment of mother love. Such a one is the present.

On November 21, 1933, the present respondent gave birth to the child whose adoption is now sought. She was in dire trouble, substantially destitute, and had been abandoned by the father of the child. Four days later she signed and acknowledged a document, which, as far as presently material, reads as follows:

" I [name of mother inserted] do hereby certify that I am the mother of the child, born November 21, 1933, at the [named] Hospital, Brooklyn, City of New York, named [name of child inserted] and now at the [named] Hospital; that the father of said child has abandoned and left me; that he has failed and refused and continues to fail and refuse to maintain, support or provide for me or for the child and that no parent, guardian or relation of said child is able to support and properly train the said child.

" For these reasons, I [name of mother inserted] do hereby voluntarily and unconditionally surrender the said child to the care and custody of [blank space left in which the name of the present petitioner was written after the execution and delivery of the instrument] and I hereby pledge myself not to interfere directly or indirectly with the custody or management of the said child in any way and I do hereby release and forever discharge and agree to hold harmless, the said [blank space left, etc., as above] and the [named] Hospital and its officers, directors and Superintendent from any and all causes of action, accounts, controversies, agreements, demands, claims and damages whatsoever in law or in equity which against them I ever had, now or which I shall or may ever have, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of these presents."

Following this were the *in testimonium* clause, the signature of the respondent and an acknowledgment in ordinary form.

The testimony respecting the understanding of the respondent at the time of the execution of this instrument is somewhat conflicting. The evidence adduced on behalf of the petitioner from the hospital authorities with whom the transactions were wholly conducted by the respondent, indicates an understanding by the latter to effect a complete and final surrender of the child. The court is, however, satisfied that the mother believed that she might reclaim the child at any time within six months, in case she recovered and became able to care for it. This conviction of the court as to the mother's understanding of the effect of the transaction is not to be construed as any reflection upon the veracity of the hospital witnesses. Their *bona fides* is wholly unquestionable. Such misunderstanding as took place was, in the opinion of the court, attributable to the serious condition in which the mother then found herself. She was unquestionably critically ill and apprehended death. She was furthermore destitute and alone, and her natural maternal instinct grasped at any proffered expedient which would assure the welfare of the child, if the apprehended result occurred, and she passed into the valley of the shadow.

Perhaps, unfortunately for her, her expectations in this regard were not realized. She recovered, and went forth to resume the battle of life. She obtained employment and, within the six months' period which she believed open to her for reconsideration, began efforts to regain the custody of the infant. At every turn she was met by a blank wall of silence. The name of the person to whom the child had been given was refused her and finally, in desperation, she retained an attorney to aid her in the quest. Formal demand for return was made, and finally sufficient information was secured to enable the institution of habeas corpus proceedings.

The hearing thereon, in the Supreme Court, terminated adversely to the mother. On September 17, 1934, an order was made, which, after reciting that the relator " did on the 25th day of November, deliberately and wilfully abandon her infant daughter," and that on that date she voluntarily surrendered it to the defendant, determined that the latter " retain the custody of the said infant child."

An appeal from this order was prosecuted, which resulted in a unanimous affirmance, without costs, the memorandum of the Appellate Division, however, reading: " We do not decide any question that may properly arise in the matter of adoption."

Since the primary question in the usual adoption proceeding where an order is sought in the face of opposition by a natural parent, is whether or not an abandonment has occurred, this memorandum was obviously designed to make clear to this court that this vital question was not to be deemed *res adjudicata.*

This memorandum, while aiding this court in the determination of the difficult problem by which it is confronted, has the result merely of adding greater clarity to what would otherwise seem uncontrovertible. In a habeas corpus proceeding such as that litigated in the Supreme Court, " the question * * * does not depend upon the absolute legal right of the parent to the custody of the child, but the important thing to be determined in any such case is the interest of the child itself. If it appears that the mother, either because of her poverty or for any other good reason, is not a proper person to be intrusted with the custody of the young person, the courts will refuse it." (*People ex rel. Dunlap* v. *New York Asylum*, 58 App. Div. 133, 135.) It follows that all which the learned justice of the Supreme Court was called upon to decide or had power to decide in that proceeding, was whether on the showing made before him on that particular day, the interests of the infant would be best promoted by his refusal to deprive the defendants of its custody and award it to the relator. (*Matter of Meyer*, 156 App. Div. 174, 176; appeal dismissed, 209 N. Y. 59; *Matter of Lee*, 220 id. 532, 539; *People ex rel: Pruyne* v. *Walts*, 122 id. 238, 242; *Matter of Davis*, 142 Misc. 681, 687; *Matter of Forte*, 149 id. 327, 333.) As the Appellate Division indicated, the problem facing this court presents entirely different questions, and is as to whether or not the demonstrated facts warrant it in completely severing all ties between the mother and the child as prayed by the petitioner in this proceeding. (*Matter of Bistany*, 239 N. Y. 19, 24.)

All persons acquainted with the law respecting adoption are familiar with the fact that such a relationship was unknown at common law, and can presently be consummated only under the conditions prescribed by statutory authority. (*Matter of Thorne*, 155 N. Y. 140, 143; *Matter of MacRae*, 189 id. 142, 143; *Matter of Ziegler*, 82 Misc. 346, 350; affd., 161 App. Div. 589; *Matter of Davis*, 142 Misc. 681, 688.)

The presently pertinent enactment is section 111 of the Domestic Relations Law, which, so far as now material, reads: " Whose consent necessary. Consent to adoption is necessary as follows: * * * Of the parents or surviving parent of a legitimate child; and of the mother of an illegitimate child, but the consent of a parent who has abandoned the child, or is deprived of civil rights, or divorced because of his or her adultery, or who is insane as defined by the insanity law or judicially declared incompetent or who is a mental defective as defined by the mental deficiency law, or adjudged to be an habitual drunkard, or judicially deprived of the custody of the child on account of cruelty or neglect, is unnecessary; excepting, however, that where such parents are divorced because of his

or her adultery, notice shall be given to both the parents personally or in such manner as may be directed by a judge of a court of competent jurisdiction."

The only portion of this paragraph which is potentially pertinent in this proceeding is that concerning abandonment. The mother has not been deprived of civil rights or declared incompetent. She is not divorced or insane. She has not been judicially deprived of the custody of the child on account of cruelty or neglect, since this clause connotes an adjudication under section 486 of the Penal Law. (*Matter of Connolly*, 154 Misc. 672.) Has she been guilty of an abandonment of the child within the meaning of the statute? This is the sole question for present determination. If it is answerable in the affirmative, her consent to the confirmation is unnecessary and her opposition thereto must be unavailing. (*People ex rel. Pickle* v. *Pickle*, 215 App. Div. 38, 44; *Matter of Davis*, 142 Misc. 681, 689.) If the facts demonstrate to the contrary, the adoption may not be granted without her consent. "While the right of the natural parents to the custody of their children is not a proprietary right in the same sense as if · the child were a chattel, * * * it has ever been regarded, even in primitive civilization, as one of the highest of natural rights. The State cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent." (*Matter of Livingston*, 151 App. Div. 1, 7.)

The question as to the nature and extent of the acts required to demonstrate an actual abandonment within the intendment of the statute has never been defined with any degree of clarity or finality. A number of judicial definitions and expressions regarding the subject were noted and discussed by this court in *Matter of Davis* (142 Misc. 681, at pp. 690 *et seq.*) and are unnecessary of present repetition. Suffice it to note that the general consensus of opinion indicates that it imports " any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." (*Winans* v. *Luppie*, 47 N. J. Eq. 302, 305; 20 A. 969; *Matter of Davis, supra,* p. 691.)

In *Matter of Broderick* (145 Misc. 445), Mr. Justice SMYTH has presented an interesting and instructive review of adjudications pertinent to the subject. The decisions determining that an abandonment had occurred, which are cited by him, and to which may be added *Matter of Larson* (31 Hun, 539) and *People ex rel. Cornelius* v. *Callan* (69 Misc. 187), were all cases in which the adoption was an accomplished fact and in which the derelict parent, who had received no notice of the proceeding, was seeking to invalidate that which · had been accomplished during the period

while such alleged improper conduct was still a continuing act. In the case at bar a different situation exists. Here the petitioners are seeking to establish the new relationship at this time, in the face of the earnest opposition of the natural mother who is now and has for almost a year been seeking authority to resume the parental duties and assert the parental claims, which, it is contended, she relinquished at the time she believed herself to be in extremis.

The question is, therefore, squarely presented as to whether an act savoring of abandonment is a continuing one incapable of revocation even during the period prior to any alteration of the legal status of the parties affected, or whether the supreme equitable jurisdiction of New Jersey is correct in its intimation that " the purpose may * * * be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent." (*Winans* v. *Luppie*, 47 N. J. Eq. 302, 305; 20 A. 969.)

It seems clear that unless the former position with all of its implications is to be adopted, the respondent in this proceeding has demonstrated in a reasonable, seasonable and unmistakable manner her desire to resume her parental duties in respect to the infant, and that the circumstance that she has not in fact done so is due solely to the acts of prevention accomplished by the petitioner. It has also been demonstrated that these acts by the mother were begun within a six months' period after the child was born and the document of surrender signed.

Among the " requisites of voluntary adoption," enumerated in section 112 of the Domestic Relations Law, is the following:

" 3. Where the child to be adopted is under sixteen years of age, the petition must show that the child to be adopted resided continuously with the foster parents, at least six months prior to the date of petition."

The purpose of this addition, which was made by chapter 323 of the Laws of 1924, was to prevent unduly precipitate action in the serious matter of establishing new relationships and severing those of blood and natural affection. Any authority having contacts with such matters is familiar with the frequently untoward results which eventuated from inconsidered action of this variety. The object sought was to give a reasonable time for reflection to the parties affected, to the end that the act of adoption, if finally consummated, would be the result of considered judgment and not of impulse or temporary pressure. It enables the persons who are contemplating the addition of a permanent member to their family to obtain a practical demonstration in miniature of the result and likewise permits the natural parents of the person to be adopted

to weigh the effect of the act which will render them utter strangers to their own flesh and blood, to the end. that the previously not uncommon exhibitions of the parental instinct resulting in kidnappings of their legally lost offspring and other like heart-rending episodes, may be avoided.

The taking of a child for adoption imposes no obligation *in rem*, if such phrase is permissible, in respect to the person the adoption of whom is contemplated. A breach of contract might conceivably result if an agreement for prospective adoption had been made, but this could be compensated only in damages, since public policy would not permit its enforcement by suit for specific performance. On grounds of mutuality and for similar reasons of public policy, a like obligation is all which should be enforcible against the natural parent, otherwise the beneficent provisions of the statute providing for opportunity for ample reflection would be nullified.

Unquestionably, in the present case, the signature by the mother of the document of surrender amounted to an act of abandonment, but, with equal certainty, her subsequent acts in endeavoring to regain the possession of the child and resume the performance of her parental duties, should be held to have terminated that abandonment, and since this termination occurred prior to any change in the legal relations of the parties, and especially since it was accomplished within a period equal to that provided by law as the reasonable time for reflection in such matters, the court deems that she has brought herself within the class of persons who, under section 111 of the Domestic Relations Law, must consent before a valid order for adoption can be made.

The court is not insensible to the fact that the material welfare of the infant might be promoted were the order of adoption to be granted. Its investigation has demonstrated that the petitioners stand high in the community and are wholly estimable people. This consideration cannot, however, be given weight. The natural mother possesses a paramount right. " The State cannot interfere with this right simply to better the moral and temporal welfare of the child * * *. If so, then the State might transfer the handsome child of poor parents to the custody of a childless couple of wealth and moral refinement against the will of the natural parent." (*Matter of Livingston*, 151 App. Div. 1, 7.)

While the disappointment of the petitioners may presently be great, the wide experience of the court in such matters inclines it to the belief that in the end their own peace of mind will better be promoted by the adoption of this course than by their involvement in an endless struggle with the instinct of mother love, reinforced by the potent incitement of religious belief arising from the knowl-

edge that a child of Roman Catholic birth is being reared in a different faith.

Obviously, the present decision leaves unaffected the question of custody, over which the Supreme Court has exercised jurisdiction, and it also does not adjudicate the liability, if any, of the natural mother by way of contract or otherwise to the present petitioners. All that is determined is that upon the facts demonstrated by the record, the court must decline to grant the prayer for the allowance of the adoption.

Enter decree on notice.