Nanette Dembitz, J.
This civil proceeding against a mother for neglect of her child presents two questions as to the construction and application of the child-adoption laws of New York 'State. The first provision in issue is the clause of section 111 of the Domestic Relations Law, providing that a parent’s consent to an adoption shall not be required if he has been judicially deprived of his child’s custody by reason of neglect. Upon the precedents discussed below, the court concludes that this statute authorizes the adoption of the child herein without the mother’s consent.[1] The second statutory problem turns on section 116 of the Family Court Act, providing that ‘ ‘ when practicable ” a child shall be committed to an agency under the control of persons of his religious faith and shall be adopted only by persons of that faith. The court holds that this religious conformity provision,[2] constitutionally and properly construed, permits the instant child’s placement with an agency under the control of persons of a different religion, as well as adoption by such persons; and it orders such a placement for adoptive purposes.
I. Dispensation with Parental Consent under Section 111 of Domestic Relations Law
A. Function of Section in Child Welfare Structure
Section 111 of the Domestic Relations Law is clear and unequivocal in its grant of power to the courts to dispense with a parent’s consent to his child’s adoption when such parent has been deprived of custody because of neglect. See Matter of Antonopulos (171 App. Div. 659 [2d Dept., 1916]), upholding the grant of an order of adoption without the consent of, or notice to the mother, on the basis that the Children’s 'Court (the predecessor of this court) had theretofore transferred the child’s custody from her to an agency because of her neglect. (Accord: Matter of Connolly, 154 Misc. 672 [Surrogate’s Ct., Kings County, 1935]; see, also,, People ex rel. Lentino v. Feser, 195 App. Div. 90, 96 [1st Dept., 1921]; Matter of Anonymous, *1021 10 Misc 2d 1076, 1079 [Sup. Ct., Nassau County, 1958]; Matter of Cohen, 155 Misc. 202, 206 [Surrogate’s Ct., Kings County, 1935].)
No judicial doubt as to the power granted by section 111 has ever been expressed, so far as this court can discover. Considering, however, “ the primacy of parental rights” (see People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 469), this court holds that the authority granted by the neglect clause of section 111 must be exercised with extreme care and only on the basis of clear and convincing evidence, after a full hearing, of compelling grounds for dispensation with parental consent (see below at “ B ” as to these procedural requirements).
Within this circumscribed orbit, the neglect clause of section 111, though currently in disuse, is a significant segment in the Legislature’s child welfare structure. Its cautious application can contribute to the solution of the outstanding and indeed overwhelming child-care dilemma posed by the large number of children in prolonged and often unconstructive foster care.[3] For example, a normally endowed and attractive 15-year-old boy recently brought before this court as an ungovernable runaway, truant, and thief, had resided in one inadequate foster home after another ever since the age of three weeks, because his mother had not wished to surrender him for adoption despite her neglect of him.
To untie such a child from his mother’s destructive hold— from a mother who blocks his opportunities for true parental care — the Legislature has provided, in addition to section 111, ' ' permanent neglect ’ ’ proceedings under article 6 of the Family Court Act and transfer of guardianship proceedings under section 384 of the Social Services Law. However, those proceedings require an elapse of at least a year and six months respectively after the child’s removal from the mother before they can even be commenced, as well as time-consuming and costly procedures before their conclusion. During this interim the child’s chances for adoption diminish substantially because of his possible development of emotional and behavioral disturbances while in foster care, and because of the relatively scarce adoptive demand for older children. With those procedural routes, the child in the case at bar would be three and a half or four years old before an adoptive home could even be sought for him. For, though *1022 the New York City Department of Social Services has had contact with the child and his mother since his birth, through administering to her thousands of dollars of Aid-to-Dependent-Children funds (colloquially known as “ A.D.C.” or “ welfare ”), it was only when the child was over two years old and through the fortuity of his hospitalization that a proceeding was commenced to remove him from the abject neglect in which he had been born and had spent his life.[4]
A failure to make the prediction at an early age that a child will never receive stable and adequate care from his parents, and a failure to act upon this prediction by freeing him for adoption at an early age, mean the probable loss of his chance for adoption. By the neglect clause of section 111, which has its counterpart in the laws of other States,[5] the Legislature affords a means to avoid the obstacles to adoption arising from the delays and other hazards attendant on permanent neglect and transfer of guardianship proceedings — provided, of course, that the circumstances are so compelling that dispensation with parental consent under section 111 is justified.
B. Procedure for Application of Section 111
One reason for the negligible use of the section 111 neglect provision is that no procedure is prescribed for its judicial consideration prior to the time of review of a petition for adoption. Unless theretofore considered, the section can be operative only for those fortunate children whose adoption is actively sought by a relative or acquaintance (and it has in fact been so used in this court in several unreported cases). For the most ill-born child, like the boy in the case at bar, for whom an adop *1023 tive home must he found by a social agency if he is to secure this benefaction, section 111 cannot be given its appropriate application unless it is considered in the neglect proceedings in this court; otherwise no adoptive home will ever be sought or adoption petition filed.[6] Consideration of section 111 in the neglect proceedings after the parent has been deprived of custody, in those extreme cases in which there is reason to believe that its use may be justified, therefore appears to this court to promote the purposes of the Domestic Delations Law and the Family Court Act, and indeed the objective of the very establishment of this court with integrated jurisdiction over various family-related proceedings. Cf. Matter of Ekstrom (24 A D 2d 276, 278 [3d Dept., 1965]), as to adaptation of procedures to basic purposes of section 111.
As to the method for consideration of section 111 in the course of neglect proceedings, the procedure in the case of adoption petitions must be noted. There the courts have dispensed with a hearing or even notice to the parent as to the application of the neglect clause, holding that the statutory condition — that the parent has been judicially deprived of custody by reason of neglect — is a matter of record that he cannot in any event controvert.[7] However, since this court holds that there must be a showing of exigent circumstances for dispensing with parental consent in addition to the bare statutory condition, due process requires that the parent have his “ day in court,,[8] as to such circumstances, with prior notice of the section 111 issue. (Cf. Matter of Toy, 19 Misc 2d 89, 91 [Surrogate’s Ct., Wayne County, 1959].) In the instant case, after the court’s removal of the child from respondent mother’s custody due to her neglect and because of information elicited during the investigation preliminary to the dispositional hearing,[9] respondent mother and her counsel were notified that the section 111 issue would there be considered; and an extensive hearing was thereafter held.
*1024 C. Findings and Conclusion as to Section 111
This court holds that the mother’s consent to the child’s adoption must be dispensed with pursuant to .section 111 of the Domestic Relations Law on the basis that it is entirely improbable that the respondent mother will ever be able to provide stable and suitable care for the child either personally or through a relative.[10] The court’s findings of fact, .supported by clear, convincing and for the most part indisputable evidence, are in summary as follows (a more detailed statement of the findings being on file in the Clerk’s office):
The child’s putative father was a narcotics addict at the time of the child’s out-of-wedlock birth on December 1, 1967 and has been in Sing Sing Prison since early 1968. The respondent mother, who states her age as 40, admittedly has been a narcotics addict for several years, and has failed to undertake the rehabilitative treatment to which she has been repeatedly referred. She lacks even the concept of the sustained effort necessary for such rehabilitation.
During most or all of the child’s life, he has resided with or been cared for by various unrelated men or women including, according to the Department of Social Services record, “ a male dressed in woman’s clothes,” a “ female impersonator,” and a “ feminine-acting male.” The mother was unable or unwilling to testify as to the child’s whereabouts or care during her incarcerations following her arrest in 1968 and four arrests in 1969 for prostitution, robbery, and possession of narcotic drugs. The mother does not even seek to undertake the child’s care personally, wanting instead that he be given to her friend Miss C, whom this court finds (for reasons detailed in the findings on file) to be flagrantly unsuitable; indeed, it finds that the respondent’s choice of this home for the child is an indication of her complete ignorance of and indifference to his needs.
Unless adopted, the child would either reside in institutions or in foster homes, or shift back and forth, for his entire minority. Certainly an adoption — which by definition means that there are parents who are seeking a permanent, deep and individualized commitment to a child — is unarguably prefer *1025 able for this rootless child. From a material standpoint as well, the couples who apply for adoptive children are generally living in better economic and social circumstances than those who accept children for foster care, which is financed by public assistance funds. Finally, the social agencies, mindful that they are creating a permanent and independent family, generally are more selective in determining the suitability of adoptive than of foster parents.
The court concludes that section 111 of the Domestic Relations Law intends to remove from a mother like respondent, who has no potential for affording her child stable or adequate care, the power to thwart the child’s opportunity to secure permanent, responsible, responsive and loving parents.
II. Construction and Application of Religious Conformity Provision
The problem posed by the religious conformity provisions (cited above, at note 2), of attributing a religious faith to this two-year-old child, is met in part by the recent ‘ ‘ parental wishes ” statute, under which he apparently should be deemed a Catholic because the mother so identified herself and expressed no contrary wish as to his religion.[11] Accordingly, the court explored through the appropriate Catholic agency the availability of adoptive parents. However, as of five weeks after the commencement of such exploration, that agency could give no assurance that adoptive parents would be available in the near future or indeed ever for the instant Puerto Rican child. On the other hand, the Windham Children’s Service, a nonsecretarian agency with high social case-work standing, offered to place the child almost immediately in an adoptive home, because it already had studied and approved as an adoptive couple a husband and wife who were applying for a Puerto Rican child (the husband being a Puerto Rican Protestant and the wife Jewish).
Matter of Maxwell (4 N Y 2d 429) teaches that religious matching of the child and the adoptive parents cannot be deemed “practicable” within the meaning of religious conformity provisions if the matching effort will be detrimental to the child’s psychic and emotional welfare. In view of the emphasis placed by child care experts on a wholesome and stable *1026 environment in early infancy,[12] — each day in the early years bringing either development or retardation,— a delay of more than a month or two in a child’s adoptive placement in order to secure religious conformity must be deemed detrimental. Indeed, even the dissenting Judges in Matter of Maxwell (supra) based their disapproval of the interreligious adoption there in issue on the ready availability of suitable adoptive parents of the same faith as the child’s (p. 440).[13]
Accordingly, the religious conformity provisions considered in Maxwell pose no obstacle to this child’s placement with the Windham Children’s Service for adoption by the only available desirable parents, though of a different religion from his, nor to adoption by such parents. However, this court must consider one proviso unique to the Family Court Act and therefore not before the Court of Appeals in Maxwell. After specifying, like other religious conformity statutes, that orders of adoption should be granted “ when practicable ” only to persons of the same religion as the child, the Family Court Act adds: “ The words ‘ when practicable ’ * * * shall be interpreted as being without force or effect * * * if there is a duly authorized * * # society or institution under the control of persons of the same religious faith or persuasion as that of the child, at the time available and willing to assume the responsibility for the custody of or control over any such child.” (§ 116, subd. [©].)
If literally applied, this paragraph would preclude a child’s adoption by persons of another religion despite the fact that such adoption would serve his temporal welfare, so long as nonadoptive custody is available by agencies under the control of his co-religionists. Such a reading of the section would, however, render it unconstitutioinal as a violation of the Fourteenth Amendment of the United States Constitution, guaranteeing equal protection of the laws and incorporating the First Amendment’s prohibitions on Government interference with religious liberty and Government support of religion.[14]
*1027 To determine upon .a constitutionally valid construction of subdivision (e) of section 116, the initial consideration is the nature of the constitutional right protected by the religious conformity provisions. Undouhtedly, the Constitution protects ‘ ‘ the liberty of parents and guardians to direct the upbringing and education of children under their control,” including their religious upbringing. (Pierce v. Society of Sisters, 268 U. S. 510, 534-535.)[15] Since this parental right is premised on a continuing parental relationship and control, the significance of the biological parent’s religious preference necessarily is more limited in regard to adoption — which severs his relationship — than in temporary transfers of custody.[16]
In relation to adoption, the biological parent’s constitutional rights would seem to entitle him at the most to express his religious or nonreligious preference as a condition of his surrender of his child for adoption. Other than this limited parental right, there appears to be no ground, consistent with the Constitution, for attributing a religious preference to an adoptive child who is below the age for actual religious training. Certainly it would be unconstitutional to stamp an adoptive child with his progenitor’s religion on the basis of any theological doctrine of a congenital transmission of faith, contrary to temporal concepts and laws on inheritance and the status of adopted children.[17] Adoption being a creature of State power and secular law, it would violate the constitutional principle of State neutrality on religion for the State in its adoption prac *1028 tices to promote church interests, or to force a religious identification upon a child.[18]
Accordingly, in construing subdivision (e) of section 116 of the Family Court Act in relation to adoption, the biological parent’s right to express a religious preference in connection with his voluntary surrender of his child, appears to be the only right that can constitutionally weigh on the side of religious conformity.[19] However, even in the case of such a voluntary surrender, the State cannot constitutionally enforce the parental religious preference at the expense of the welfare of the child. For, the 'State’s power with respect to the custody and adoption of children stems from its duty as parens patriae to safeguard the welfare of the helpless and dependent.[20] Even parents with custody of their child cannot for the sake of his religious upbringing obstruct his temporal welfare.[21] Certainly this principle is all the more true when the parent’s right is attenuated by the fact that he is surrendering his responsibility for his child.
It is clear that the State unconstitutionally denies to a child the equal protection of the laws — specifically his right to equal protection of his welfare — if it deprives him of the opportunity for a beneficial adoption because of his birth to a parent of a particular religion or religious preference.[22] The State is obliged as parens patriae for its children to regulate its adoption *1029 practice to secure for them the best available adoptions ;[23] and it is constitutionally prohibited from sacrificing this paramount objective to religious interest (see above, notes 18 and 21). Accordingly, for section 116 of the Family Court Act to survive constitutional tests, subdivision (e) must be construed— in relation to children whose welfare is best served by adoption —■ to require their placement with persons of the same religion or an agency under the control of such persons, only if such placement will neither preclude nor substantially delay their adoption.
Thus construed, section 116 authorizes the instant child’s placement for adoption through the Windham Children’s Service, a nonsectarian agency, with persons of a different religion, no suitable persons of the same religion being available. It is so ordered.

. The child being out of wedlock, only the mother’s consent is relevant under subdivision 3 of section 111 of the Domestic Relations Law.

. The provision is partially duplicated in section 32 of article VI of the State Constitution and also in section 373 of the Social Services Law, which is incorporated by reference in section 110 of the Domestic Relations Law.

. As to this problem, see Welfare and Health Council of New York City, Children Deprived of Adoption (1955); Note, 64 Yale L. J. (1955) 772, 778; Lewis, Foster-Family Care: Has it Fulfilled Its Promise, 355 Annals of Amer. Academy of Political & Social Science (1964, hereinafter cited as Annals) 36-37; New York Times for Aug. 1, 1970, p. 20, col. 5; for Aug. 10, 1970, p. 23, col. 3.

. Cf. James v. Wyman, 303 F. Supp. 935 (S. D. N. Y., 1969, app. pending U. S. Sup. Ct., No. 977, Oct. Term 1969) prohibiting home visits by Department of Social Services workers without the mother’s consent or a search warrant. Even under the system of visits by appointment, the worker discovered, only months after the fact, that the mother herein had been incarcerated from October 29 to December 9, 1969. The child’s whereabouts and care during that period and during her previous incarcerations, as well as the times of such previous incarcerations, were never determined by the department. Cf. Simpson, The Unfit Parent, 39 Univ. of Detroit (1962) 347, 351 — 352: “The neglected child * * * can be permanently marred before society steps in to protect him ”.

. See, for example, Code of Georgia (Adoption) § 74r-403; Illinois Rev. Stats, eh. 4, § 9.1-8, subd. [d]; Iowa Code, § 600.3; Minnesota Stat., § 260.221; Rev. Code of Montana, § 61-205; Wisconsin Children’s Code, § 48.40. See, also, Child Welfare League of America, Standards for Adoption Service (1968) par. 7.28; Legislative Guides for Termination of Parental Rights and Responsibilities (U. S. Children’s Bur. 1961) 15, 40-41. None of these statutes or standards specify any minimum period of neglect as a requirement for termination of parental rights because of neglect.

. See Ritz, Termination of Parental Rights to Free Child for Adoption, 32 N. Y. TJ. Law Rev. (1957) 579, 583, as to failure to place children for adoption who are in need of it because of “ nullification ” in practice of “ the statutory provision dispensing with parental consent in cases where the parent has been guilty of misconduct.”

. See Matter of Antonopulos, 171 App. Div. 659, 661, supra; People ex rel. Lentino v. Feser, 195 App. Div. 90, 96, supra.

. See Matter of Davis, 142 Misc. 681, 689-690 (Surrogate’s Ct., Kings County, 1932) and cases there cited; also Matter of Davison, 44 N. Y. S. 2d 763, 765-766 (Surrogate’s Ct., Kings County, 1943).

. See Family Ct. Act, §§ 1044, 1045, 1047, 1048, as to sequence of hearings in neglect cases.

. At to reasons for dispensing with parental consent, compare Matter of Toy, cited above: “ the mother * * * is objecting to this adoption only because of some selfish reason to keep for herself the right of being their mother, but let others raise and be responsible for and love them ” (19 Misc 2d at p. 91); Child Welfare League of America (1968) par. 7.28: parental rights should be terminated when “parents have clearly shown no interest, desire or capacity for giving the child the love, care and protection he needs, and in all probability will not be able to do so see, also, Emons v. Dinelli, 235 Ind. 249 (1956).

. Laws 1970, eh. 494 (Family Ct. Act, % 116, subd. [g]; Social Services Law, § 373, subd. 7), eff. May 8,1970; see Polier, Religion and Child, N. Y. L. J. for May 25, 1970, p. 1.

. See Schoenberg, Adoption: The Created Family, in Annals, cited above note 3, p. 70.

. See also statement of National Conference of Catholic Charities in Child Welfare League of America, Standards for Adoption Service (1968) 19, recognizing that religious matching may be precluded by the unavailability of adoptive parents of the relevant religion; see also Katz, Judicial and Statutory Trends in Law of Adoption, 51 Georgetown L. J. (1962) 64, 70.

. Literal observance of this proviso appears to be a factor in the permanent foster care of some Puerto Rican children who, like the instant child, in infancy are desired for adoption by couples of a different religion.

. See, also, Meyer v. Nebraska (262 U. S. 390, 399) as to the individual’s “ liberty * * * to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience ”; Board of Educ. v. Barnette, 319 U. S. 624, 629-630; People ex rel. Portnoy v. Strasser, 303 N. Y. 539, 544; People ex rel. Sisson v. Sisson, 271 N. Y. 285, 287.

. See Pfeifer, Religion in the Upbringing of Children, 35 Boston Univ. L. Rev. (1955) 333, 377; Ramsey, The Legal Imputation of Religion in Adoption Proceedings, 34 N. Y. U. L. Rev. (1959) 649, 653, 679.

. See Domestic Relations Law, § 117; Matter of Park, 15 N Y 2d 413; Matter of Silberman, 23 N Y 2d 98.
As to the suggestion that the religious conformity provisions are to protect the child’s right to the biological parent’s religion (see Matter of Santos, 278 App. Div. 373, 375 [1st Dept., 1951]), the only constitutional argument that comes to mind is too ephemeral for serious consideration: an argument that the child had a “ right ” to a fit natural parent who would have been likely to raise him in his religion. Even if an infant undergoes a religious baptism ceremony, he has no right cognizable by civil authority to be raised in that religion because the constitutional right to freedom of religion means the individual’s right “to choose his religion.” Joseph M. Snee, S.J., Religion in Adoption and Custody, in Proceedings of Institute of Church and State (Villanova Univ., 1957) 78.

. “ Government may not * * * use secular institutions to force one or some religion on any person.” (Zorach v. Clawson, 343 U. S. 306, 314.) See, also, Engel v. Vitale, 370 U. S. 421, 425; Everson v. Board of Educ., 330 U. S. 1, 15; Paulsen, Constitutional Problems of Utilizing a Religious Factor in Adoption and Placement of Children, in The Wall Between Church and State (edited by Oakes, 1963) 117, 136-140; Note, 65 Harv. L. Rev. (1952) 694, 695.

. While the instant case does not involve a voluntary surrender for adoption, subdivision (e) of section 116 applies to all adoptions and surrendered children must therefore be considered in construing it.

. See Finlay v. Finlay, 240 N. Y. 429, 433-434; Matter of Gustow, 220 N. Y. 373, 376-377.

. See Prince v. Massachusetts, 321 U. S. 158, 165-166; People v. Pierson, 176 N. Y. 201; State v. Perricone, 37 N. J. 463 (1962); People ex rel. Wallace v. Labrenz, 411 Ill. 618 (1952), cert. den. 344 U. S. 824; Matter of Black, 3 Utah 2d 315 (1955).
And State aid to religion is constitutional only if it is secondary and incidental to promotion of the general welfare. (McGowan v. Maryland, 366 U. S. 420, 442, 445, 449.)

. See Lustig, The Religious Factor in New York Adoption Proceedings, 18 Syracuse L. Rev. (1967) 825, 833-834, suggesting that the would-be adoptive parents would also be denied equal protection. Cf. Wener v. Wener (35 A D 2d 50, 54) as to “ grave constitutional problems of equal protection in separation of church and State ” if religious law were applied by a secular court.

. Religious matching may be conducive to the child’s welfare when more than one desirable adoptive family is available, for the identity of religion of the biological and adoptive parents may be useful in promoting a sense of identification between the adoptive parents and the child (see dissenting opinion in Matter of Maxwell, 4 N Y 2d 429, 439).