**Shirley WILDER et al., Plaintiffs,**

**v.**

**Jule SUGARMAN et al., Defendants.**

**No. 73 Civ. 2644 HRT.**

United States District Court,
S. D. New York.

Nov. 19, 1974.

Marcia Robinson Lowry, New York Civil Liberties Union, New York City, Charles Schinitsky, Carol Sherman and Deborah G. Steinberg, The Legal Aid Society, Brooklyn, N. Y., for plaintiffs.

Adrian P. Burke, Corp. Counsel, for defendants, Jule Sugarman, Barbara Blum, Elizabeth Beine and Adolin Dall, by James G. Greilsheimer, Carmella Ackman, Asst. Corp. Counsels, New York City.

David H. Berman, New York City, for defendants, Florence M. Kelley, Abe Lavine and George Chesbro.

Milburn & Ackerman, New York City, for defendant Talbor Perkins Children's Services.

Hale, Grant, Meyerson, O'Brien & McCormick, New York City, for defendant, Edmund G. Burbank, individually and as Administrator of Sheltering Arms Children's Services.

McDermott & Torpy, Peekskill, N. Y., for defendant, Sister Mary Patricia Kelley, individually and as Executive Director of Villa Loretto.

Migdal, Tenney, Glass & Pollack, New York City, for defendant, Veleria E. Bullard, individually and as Executive Director of Hillcrest Center for Children.

Austin J. Power, New York City, for defendant, Vernon Daniels, individually and as Executive Director of Society for Seamen's Children.

Martin & Carey, New York City, for defendant, Dr. Edward L. Hawthorne, individually and as Administrator of Brooklyn Home for Children.

Satterlee & Stephens, New York City, for defendant, Robert M. Bauers, individually and as Administrator of Lutheran Community Services.

Amend & Amend, New York City, for defendant, Sister Laura Marie, individually and as Executive Director of St. Germaine's Home.

Willkie, Farr & Gallagher, New York City, for defendant, Msgr. Edmund F. Fogarty, individually and as Administrator of Mission of the Immaculate Virgin.

Morton L. Deitch, Donald L. Newborg, New York City, for defendant, Jacob L. Trobe, individually and as Executive Director of Jewish Child Care Assn.

Bodell, Gross & Magovern, New York City, for defendants, William H. Bennington, individually and as Executive Director of St. Christopher's School; Sister Mary Kiernan, individually and as Administrator of Cardinal McCloskey School & Home; Dr. Ian A. Morrison, individually and as Administrator of Greer, A Children's Community; Sister Marita Paul, individually and as Administrator of St. Joseph's Home of Peekskill; Sister Marian Cecilia Schneider, individually and as Administrator of The New York Foundling Hospital; Rosemary A. Sheridan, individually and as Administrator of St. Cabrini Home, Inc.; Sister Della Mae Quinn, R.S.M., individually and as Administrator of St.

Michael's Home; and Sister Rose Vincent, individually and as Administrator of St. Agnes Home and School for Children.

Polier, Tulin & Clark, New York City, for defendant, Florence Kreech, individually and as Executive Director of Louise Wise Services.

Bleakley, Platt, Schmidt & Fritz, New York City, for defendant, Etta M. Stelle, individually and as Administrator of Speedwell Services for Children.

Humes, Andrews, Botzow & Wagner, New York City, for defendant, Rev. William J. Winterrowd, individually and as Executive Director of St. Peter's School.

Reilly, Fleming & Reilly, New York City, for defendant, Sister Merced, individually and as Administrator of Divine Providence Shelter.

Cullen & Dykman, Brooklyn, N. Y., for defendant, John D. Lyman, Jr., individually and as Administrator of Brookwood Child Care.

Davis, Polk & Wardwell, New York City, for or of counsel to 25 defendants.

Robinson, Silverman, Pearce, Aronsohn, Sand & Berman, New York City, for defendant, Dr. Jerome M. Goldsmith, individually and as Executive Director of Jewish Board of Guardians.

Marcel Weber, New York City, for defendant Lester Kaufman, individually and as Administrator of Ohel Children's Home Fund, Inc.

Bernstein, Seawell, Kaplan, Block & Weiner, New York City, for defendant Dora Zucker, individually and as Administrator of Hebrew Children's Home.

Patrick Campbell, New City, N. Y., for defendant Donald Porcaro, individually and as Administrator of St. Agatha Home for Children.

Fox & Meyer, New York City, for defendant Isaac Maizes, individually and as President of Maimonides Residential Center.

Harry A. Gross, New York City, for defendant Tev Goldsman, individually and as Executive Director of Blueberry, Inc.

Gruberg, McKay, O'Keefe & Barranco, New York City, for defendants Ruth V. Freedman, individually and as Administrator of Salvation Army Foster Home and Adoption Services, and Brigadier Henry Berkhoudt, individually and as Superintendent of Wayside Home School for Girls.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant Douglas W. Merrill, individually and as Executive Director of Woodycrest Five-Points Child Care.

Sage, Gray, Todd & Sims, New York City, for defendant Sister Mary Patrick, individually and as Administrator of St. Dominic's Home.

Spengler, Carlson, Gubar & Churchill, New York City, for defendant Russell C. Snow, individually and as Administrator of Jennie Clarkson Home.

Weller, Rogers, Bergen & Froessel, Jamaica, N. Y., for defendant Severin J. Laliberte, individually and as Administrator of Ottilie Home for Children.

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for defendants William M. Griffin, individually and as Director & Julia Dyckman, Andrus Memorial Home and Lester Peddy, individually and as Director of Brooklyn Bureau of Community Services.

Joseph W. McGovern, New York City Hurley, Kearney & Lane, Brooklyn, N. Y., for amici curiae; Archdiocese of New York and Catholic Charities, Diocese of Brooklyn.

Louis H. Pollak, University of Pa. Law School, Philadelphia, Pa., for amicus curiae, Citizens' Committee for Children of New York, Inc.

Karl D. Zukerman, Richmond, for amicus curiae, Federation of Jewish Philanthropies of New York.

Norman Dorsen, New York City, for amicus curiae, Federation of Protestant Welfare Agencies, Inc.

Before MANSFIELD, Circuit Judge, and TYLER and DUFFY, District Judges.

## OPINION

PER CURIAM.

On June 14, 1973, plaintiffs commenced this action seeking a declaration that the New York constitutional and statutory provisions for child placement violate the First, Eighth and Fourteenth Amendments on the grounds that they discriminate against children who are black and Protestant. The plaintiffs are six named children for whom guardians *ad litem* have been appointed.

The complaint names as defendants, individually and in their respective capacities, the heads of the New York City Human Resources Administration, Special Services for Children, Bureau of Child Welfare and its Division of Inter-Agency Relationships, as well as various New York State officials, including the Administrative Judge of the Family Court, the Commission of the New York State Department of Social Services and the Executive Director of the New York State Board of Social Welfare. In addition to these public officials, the administrators and executive directors of all 77 agencies providing child care in New York City have been named.

■ In addition to seeking a declaration that the New York constitutional and statutory provisions are violative of the Constitution and an injunction against their continued enforcement, plaintiffs claim consequential and punitive damages against the public officials and the heads of the child-care agencies.[1]

On September 21, 1973, the assigned judge granted plaintiffs' motion to convene a three-judge court pursuant to 28 U.S.C. §§ 2281 and 2283. On June 4, 1974, the statutory court stated its de-

---

1. Defendants' argument that plaintiffs are without standing to sue is without merit. See, e. g., Abington School District v. Schempp, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1961); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

sire to take under advisement, prior to the completion of discovery, plaintiffs' allegations that the constitutional and statutory provisions of state-wide application facially violate the Establishment Clause of the First Amendment. On June 7, 1974, a pre-trial order was entered, defining the issue before the court as follows:

> "[w]hether New York Social Services Law § 373(1), (2) and (5), New York State Constitution Article 6, § 32, Family Court Act § 116(a), New York Social Services Law § 153 and New York Constitution Article 7, § 8(2) violate the Establishment Clause of the First Amendment to the Constitution of the United States on their face. . . . "

and further directing that, for purposes of this portion of the case, the only facts to be considered shall be those admitted by all the parties in their answers to the complaint and those facts which are properly the subject of judicial notice.

Thus, the present proceeding involves only the facial constitutionality of the New York State constitutional and statutory provisions regarding religious matching for publicly-funded foster care of children. It does not concern any aspect of the application of these provisions in specific instances.

## I

An analysis must begin with a delineation of the general statutory structure of the child placement system of New York.[2] The system has its modern genesis in Article VI, § 32 of the New York Constitution, which provides that a child "shall be committed or remanded or placed, when practicable, in an institution or agency governed by persons, or in the custody of a person, of the same religious persuasion as the child." This constitutional provision is implemented by § 373 of the New York Social Services Law, McKinney's Consol. Laws, c. 55, which states in pertinent part:

> "1. Whenever a child is committed to any agency, association, corporation, institution or society, other than an institution supported and controlled by the state or a subdivision thereof, such commitment shall be made, when practicable, to an authorized agency under the control of persons of the same religious faith as that of the child."

Amendments to § 373 of the New York Social Services Law and § 116 of the New York Family Court Act supplement the religious matching provision by specifying that the provisions of those sections "shall, so far as consistent with the best interests of the child, and where practicable, be applied so as to give effect to the religious wishes of the [parents]." New York Social Services Law § 373(7); New York Family Court Act § 116(g).

With respect to public payment of the expenses of caring for the children, Article 7, § 8(2) of the New York Constitution asserts that nothing shall prevent the Legislature from providing, *inter alia,* for:

> " . . . the aid, care and support of neglected and dependent children and of the needy sick, through agencies and institutions authorized by the state board of social welfare or other state department having the power of inspection thereof, by payments made on a per capita basis directly or through the subdivisions of the state . . . ."

This is implemented by § 153 of the Social Services Law allowing for reimbursements by the State to social services districts, cities, and towns for the administration of public assistance programs.

At least theoretically, then, the issues now before the court present a clash between the Establishment and Free Exercise Clauses of the First Amendment.[3] The inevitability of the conflict result-

---

2. The full text of the challenged provisions can be found in the Appendix.

3. The First Amendment to the United States Constitution provides in pertinent part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

ing from expression of these competing concepts in absolute terms has been the subject of opinions of the Supreme Court. E. g., Wisconsin v. Yoder, 406 U.S. 205, 214, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Tilton v. Richardson, 403 U. S. 672, 677, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Abington School District v. Schempp, 374 U.S. 203, 217–222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

We are guided in our present task by an admonition of the Supreme Court in Walz v. Tax Commission. Mr. Chief Justice Burger, in his opinion for the Court, there stated:

"The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." Walz, supra 397 U.S. at 669, 90 S.Ct. at 1411.

Nevertheless, ascertainment of the proper "wall" between Church and State as envisioned by Thomas Jefferson in the famous "Virginia Bill for Religious Liberty" [4] in a given context is, as always, fraught with difficulties.

## II

The history of the child welfare system in New York is necessarily intertwined with the religious history and cultural development of the State. Acknowledging that history and long use do not sanction practices inherently unconstitutional, we cannot ignore New York's historical commitment to relatively sophisticated child welfare and placement practices since early colonial days. See, Walz, supra, 397 U.S. at 678, 90 S.Ct. 1409. As a Dutch colony, New York provided for poor relief through ecclesiastical bodies, with the local civil authority assuming a role only where there was no religious body to do so.[5] At the time of the American Revolution, New York assumed direct administration of relief. Almshouses were built which commingled the aged, the insane, the mentally diseased and orphans. Children composed approximately 40% of the almshouse population.[6]

Until the establishment of the first orphan asylum in 1806, the Orphan Asylum Society, the almshouse remained the only type of charitable institution in the State for the reception of dependent children.

In 1856, a committee of the State Senate investigated and, subsequently, recommended the "removal of children from poorhouses and their placement in orphanages and similar institutions for special care." Fensterstock, History of New York Social Welfare Legislation,

---

4. The "Virginia Bill for Religious Liberty," a blueprint for religious freedom, is a statutory enactment of the concepts delineated in the First Amendment. The Bill states:
   "That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief. . . ." 12 Hening, Statutes of Virginia 84 (1823); Comma-

ger, Documents of American History 125 (1944).

5. For a discussion of the welfare system of New York, see Schneider & Deutsch, The History of Public Welfare in New York State 1867–1940 at 3 (1941) (hereinafter "Schneider and Deutsch"); D. Schneider, The History of Public Welfare in New York State 1609–1866 at 179–191 (1969) (hereinafter "Schneider").

6. Schneider at 181–185.

Introduction, N. Y. Social Welfare Law, McKinney's Vol. 52A, ix, xxiii (1966). During the following decade, towns and counties expanded their resources by contracting with private orphanages to receive and maintain their charges at public expense.

The religious matching provisions of the present statutory provisions have their origin in Chapter 173 of the 1875 Laws of New York, which removed the children between the ages of 3 and 16 from the almshouses, directed that they be placed with families, orphan asylums, or other institutions, and required that public authorities make provision for their maintenance. That statute further stated that:

" . . . In placing any such child in such institution, it shall be the duty of the officer, . . . to commit such child to an orphan asylum, charitable or other reformatory institution that is governed or controlled by officers or persons of the same religious faith as the parents of such child, as far as practicable." [1875] Laws of N.Y. ch. 173, § 2.

Within two or three years, the support of destitute children at public expense in private institutions became the settled policy of the State. The language of the matching provisions was altered somewhat in 1879 by the Legislature to read:

" . . . When any such child is committed to any orphan asylum or reformatory, it shall, when practicable, be committed to an asylum or reformatory that is governed or controlled by persons of the same religious faith as the parents of such child." [1879] Laws of N. Y. ch. 240, § 1.

During the next decade, the number of private institutions throughout the State of New York increased dramatically from 132 institutions caring for 11,907 children to 204 institutions caring for 23,592 children in 1885. By 1888, in New York City alone, 15,000 children were being cared for in private institutions.[7]

The principle of religious matching was retained in 1898 when the statute was again amended to read as follows: "In every case where practicable, any child placed out shall be placed with individuals of like religious faith as the parents of the child." [1898] Laws of N.Y. ch. 264, § 6.

By the end of the nineteenth century, the pattern of child care in the State had become so well defined that it was known as the "New York System." The "System" primarily consisted of placing dependent and neglected children who were public charges under the care of private agencies, with the responsible counties, cities and towns paying for the services provided.[8]

In 1921, New York became the first state to embody the religious matching principle specifically in its Constitution. In that year, a concurrent resolution of the Senate and Assembly amended then § 18 of Article 6 to include the following language:

"[W]henever a child is committed to an institution or is placed in the custody of any person by parole, placing out, adoption or guardianship, it shall be so committed or placed, when practicable, to an institution governed by persons, or in the custody of a person, of the same religious persuasion as the child." [9]

The principles expressed in the quoted language more recently have been expressed in § 32 of Article 6 of the New York Constitution. Section 32 in its present form was adopted in 1959,[10] approved by the voters on November 7, 1961, and became effective on September 1, 1962.

In 1970, a bill aimed at further clarifying § 373 of the Social Services Law and §.116 of the Family Court Act was

7. Schneider & Deutsch, at 65.

8. Schneider & Deutsch, at 160.

9. [1921] 1–3 Laws of N.Y. at 2534. This provision became effective January 1, 1926.

10. See [1960] 2 Laws of N.Y. at 2661, 2682.

passed with widespread endorsement, including approval by representatives of the Catholic, Jewish and Protestant faiths and by nonsectarian agencies and groups. The bill was also approved by the Association of the Bar of the City of New York, and New York County Lawyers Association, the New York State Bar Association and the Attorney General of the State of New York.[11] Most significantly, for our purposes, the act added subsection 7 to § 373 and subsection (g) to § 116.[12] Briefly, the statutes were altered to provide for religious placement in accordance with the wishes of the biological parent, "so far as consistent with the best interest of the child, and where practicable . . .. Religious wishes of a parent shall include wishes that the child be placed in the same religion as the parent or in a different religion from the parent or with indifference to religion or with religion a subordinate consideration." [13]

Thus, since 1970, the New York constitutional provisions and statutes, far from requiring or mandating placement according to religion, simply permit such placement "so far as consistent with the best interests of the child, and where practicable." Necessarily, the agencies have responded to the diversified needs of children by the development of a variety of facilities and programs. These range from the so-called "open setting" residences (which provide living quarters and related services to adolescents needing relatively little supervision) to institutions which are designed for children who, because of infancy or other factors, require a high degree of supervised care or specialized physical or psychiatric services. These physical and psychological needs form the basis for additional factors which, along with religion, must be taken into account in the placement process. Proper placement requires that care must be taken not only to ensure that the child is placed in an environment which will be appropriate for his or her needs, but also to ensure that the placement of a child in a particular setting will not, through such matters as introduction of drug usage or other antisocial behavior, adversely affect the lives and well-being of the other children in the group.

### III

■ Plaintiffs here do not contend that religion may not be a factor in New York's child placement process. Rather, they argue that insofar as the statutory scheme "mandates" placement of children in accordance with their religion or that of their parents, it is unconstitutional. Defendants counter with the submission that the statutory phrases "when practicable" and "so far as consistent with the best interest of the child, and where practicable" are controlling—i. e. that such phrases render the New York scheme permissive rather than mandatory.

This phraseology has been authoritatively and recently interpreted by the Court of Appeals of New York in Matter of Dickens v. Ernesto, 30 N.Y.2d 61, 330 N.Y.S.2d 346, 281 N.E.2d 153, appeal dismissed for want of a substantial federal question, 407 U.S. 917, 92 S.Ct. 2463, 32 L.Ed.2d 803 (1972). *Dickens* involved the identical statutory provisions, with the exception of the funding sections, and resolved the dispute of whether placement—specifically, adoption—in accordance with the religious wishes of the parents was mandatory or merely permissive. The court by Chief Judge Fuld unequivocally stated:

"It is thus apparent, first, that religion is but one of many factors in the placement of a child for adoption and, second, that placement in conformity with 'the religious wishes of the parents of the child,' though desirable, *is*

---

11. Polier, Religion and Child, N.Y.L.J. May 25, 1970, p. 1, cols. 4–5.

12. These subsections are reproduced in full in the Appendix to this decision.

13. [1970] Laws of N.Y. ch. 494, § 2.

*not mandatory."* 30 N.Y.2d at 65, 330 N.Y.S.2d at 348, 281 N.E.2d at 115. (emphasis added)

A clearer statement by the highest state court of the permissive nature of the statute can scarcely be imagined. See, also, Matter of Efrain C., 63 Misc.2d 1019, 314 N.Y.S.2d 255 (Family Ct. N. Y.Co.1970); Note, 56 Cornell L.R. 780, 795 n. (1971).

Understandably, defendants urge that *Dickens* controls the case at bar. We are disinclined to literally take that view of this case and, as will be seen, rest our decision upon a different analysis.

■ In considering the facial constitutionality of New York's laws governing placement of children in foster care, we cannot compartmentalize one or two laws, such as the religious-matching provision,[14] and ignore their close relationship to others, such as the public funding statutes.[15] All are interrelated and to some extent interdependent. Were one to take away the statutes authorizing the public funding of foster care, the religious-matching laws would thereupon be seriously handicapped or largely rendered ineffective, at least insofar as they regulate foster care. The possible vulnerability of the funding statutes under the Establishment Clause, furthermore, turns on the fact that they are relied upon and used to implement the religious-matching laws. The various laws under attack form one uniform legislative scheme designed to enable the state to fulfill its obligation to provide foster care for needy and dependent children, including their essential educational and religious requirements. In construing them we must be guided accordingly. See, Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L. Ed.2d 492 (1962); Two Guys from Harrison, Allentown v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961); Marine Carriers Corp. v. Fow-

ler, 429 F.2d 702, 706–707 (2d Cir. 1970), cert. denied, 400 U.S. 1020, 91 S. Ct. 581, 27 L.Ed.2d 631 (1971).

When New York's religious-matching, funding and foster care laws are considered together as one legislative scheme, we cannot ignore the fact that they authorize the funding of foster care by religious institutions dedicated to the propagation of their respective faiths. Nor can we assume, because the funding statutes make no reference to religion on their face, that none of the funds authorized for care of needy and dependent children are being paid to religious agencies for foster care.

The question is whether the scheme as a whole violates the prohibitions of the Establishment Clause, which have been defined generally by Justice Black in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), in the following oft-quoted passage:

> "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church

14. N.Y.Const., Art. VI, § 32; N.Y. Family Ct. Act § 116(a); N.Y. Social Welfare Law § 373(1), (2) and (5).

15. N.Y.Const., Art. VII, § 8(2); N.Y. Social Welfare Law § 153(1)(a), (1)(d) and (4).

and State.'" 330 U.S. at 15–16, 67 S. Ct. at 511–512.

Once the statutes under attack are considered as parts of one legislative scheme, this case becomes distinguishable in significant and crucial legal respects from Matter of Dickens v. Ernesto, *supra*. In the present case, the statutes authorize the state to fund religious institutions providing foster care. No such funding existed in *Dickens*, which involved the placement of children for adoption without payment by the state to the adopting parents. There the attack was leveled solely at those statutes which authorize the state to designate the adopting parents on a religious-matching basis, see N.Y.Const., Art. VI, § 32; N.Y. Family Ct. Act § 116; N.Y. Social Welfare Law § 373; N.Y. Domestic Relations Law, McKinney's Consol.Laws, c. 14 § 113, and not at a legislative scheme that included funding of religious agencies. In *Dickens*, the New York Court of Appeals construed the matching provisions as discretionary rather than as mandatory, holding that they merely permit the state "where practicable" to take religion into consideration as a factor along with others in deciding what adoption would be "consistent with the best interests of the child." The court concluded that the matching laws, insofar as they govern adoption of children, satisfy the tripartite test prescribed by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), reflecting and preserving a be-

nevolent neutrality toward religion. Even if we accepted this interpretation of the state's religious-matching laws as permissive rather than mandatory—a course which we are prepared to follow since the construction emanates from the state's own highest court and presumably governs those administering the laws [16]—we doubt that *Dickens* "controls" this case, which deals with *state-funded* religious care.

Thus, in the instant case we are concerned with statutes authorizing the state's expenditure of some $194 million annually on foster care, see N.Y. Dept. of Social Services, 1973 Annual Report, Appendix B, a substantial percentage of which is paid to religious institutions.[17] The authorization of these payments to religious institutions presents a different legislative scheme for the provision of child care than that confronted in *Dickens* and requires a new and different application of the Establishment Clause test. That test was summarized by the Supreme Court in Lemon v. Kurtzman, *supra*, as follows:

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; . . . finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U.S. at 612–613, 91 S.Ct. at 2111 (citations omitted).

▇ When New York's funding provisions are considered along with its religious-matching laws, it is clear that

---

16. That religious-matching is discretionary rather than mandatory would not necesarily render the matching system constitutionally permissible. There is, of course, the danger that in practice the discretion might be exercised by the state to favor one religion as being in the "best interest" of children generally and as being "practicable" because institutions propagating that religion had the most suitable facilities. Furthermore, there is the risk that a child of one religion might, notwithstanding the urgent plea of his parents that he be placed in a home or institution operated by persons of the same religious persuasion as his parents, be placed in an entirely different religion, likewise be-

cause such placement is deemed to be in the child's best interests, in which event he and his parents would undoubtedly argue that the placement violated their Free Exercise rights.

17. As of June 30, 1974 some 49,062 children were placed in foster care in the State of New York, of which approximately 97% were completely or partially supported by the state. Of these 49,062 children, 34,786, or 71% were in family foster homes and the balance, 14,276 or 29%, were in institutions, group homes, or boarding homes. (Figures provided by N.Y. Bd. of Social Welfare.)

these statutes, insofar as they govern foster care, do not have a solely secular purpose. One of their principal objectives is to provide for the religious education of foster children in accordance with the parents' wishes. Even if their purpose were otherwise, i. e., to provide food, clothing, shelter and education, it must be recognized that in many of the institutions in which the children are placed the religious authority is pervasive and that the "process of inculcating religious doctrine is . . . enhanced by the impressionable age of the pupils." Lemon v. Kurtzman, *supra,* 403 U.S. at 616, 91 S.Ct. at 2113. Absent countervailing circumstances, the effect could be to impermissibly inculcate religion. Furthermore, while the funds expended by the state may be and are for the most part expended for the child's temporal needs (food, shelter, clothing, etc.), nothing in the state's statutes precludes the state from making payments for the child's religious needs and thus directly supporting the religion involved. Indeed, the form of contract entered into by the Department of Social Services with foster care agencies expressly provides that the basic care for which payment is made includes "the arrangement, as needed, of religious training." (See Appendix to Brief on behalf of Executive Directors of Brooklyn Home for Children and other Agencies, p. 3). Nothing in the statute obligates the recipient to earmark the funds for use solely for the child's temporal needs. The important point for present purposes is that, regardless of how the state's statutes are labelled and whether or not payments made under them exceed the actual cost of the child's secular needs, the religious institutions or agencies are free under the statutes to use the funds for advancement of the religions propagated by them.

Where there is a prospect that governmental payments, direct or indirect, may be used for sectarian purposes, laws authorizing such funding, even though enacted for socially laudable purposes, have been invalidated as violative of the Establishment Clause because their primary or principal effect is to advance religion. See, e. g., Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); Levitt v. Committee for Public Education, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); Lemon v. Kurtzman, *supra*; Public Funds for Public Schools v. Marburger, 358 F.Supp. 29 (D.N.J. 1973), affd., 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974). For instance, in Committee for Public Education v. Nyquist, *supra,* the Supreme Court struck down provisions of New York's Education Law, Art. XII, §§ 549–553, McKinney's Consol.Laws, c. 16 (Supp. 1972–73), which authorized grants of money to non-public schools for repair and maintenance of school facilities and equipment, as violative of the Establishment Clause for the reason that nothing in the statutes barred a qualifying non-public school from using the funds "to pay salaries of employees to maintain the school chapel, or the cost of renovating classrooms in which religion is taught." 413 U.S. at 774, 93 S.Ct. at 2966. The Court concluded that "[a]bsent appropriate restrictions on expenditures for these and similar purposes, it simply cannot be denied that this section has a primary effect that advances religion in that it subsidizes directly the religious activities . . . ." *Id.* In response to the argument that the statute only provided for 50% of the ordinary maintenance costs of a public school and thus the payments would only go for upkeep of purely secular facilities, the Court further held that "a mere statistical judgment will not suffice as a guarantee that state funds will not be used to finance religious education." *Id.* at 778, 93 S.Ct. at 2968. Absent countervailing circumstances demonstrating that these statutes, though violative of the literal language of the Establishment Clause, are nevertheless reasonably essential to the implementation of other equally important provisions of the Constitution, they would be vulnerable as unwarranted governmental involvement in religion.

This raises the question whether, since the religious-matching statutes were enacted in recognition of the rights of parents and foster children freely to exercise their religious beliefs, the public interest in free exercise of religion entitles them to be upheld despite their involvement of the state in religion. To determine whether such a reconciliation is possible, an analysis of these apparently conflicting interests and of the roles of the government and of the parent in the care and education of foster children is necessary.

Over the years certain fundamental principles have been developed with respect to (1) the rights and duties of parents in the religious upbringing of their children, and (2) the function of the state in providing foster care. It is settled that under the Constitution a parent has the authority to determine its child's religious upbringing. This basic concept was recognized in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), where the Supreme Court invalidated an Oregon statute which, by mandating public school education, had precluded children from obtaining a parochial school education. In holding this law to be an unreasonable interference with the liberty of parents and guardians to direct the education and upbringing of their children, the Court stated:

"The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535.

The primacy of this parental right under the Free Exercise Clause has repeatedly been restated, see Griswold v. Connecticut, 381 U.S. 479, 482, 483, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Prince v. Massachusetts, 321 U.S. 158, 165–166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). Recently, for instance, in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court, in upholding a challenge by members of the Amish Mennonite church to a state compulsory high school attendance law on the ground that it violated the parents' rights under the Free Exercise Clause to direct the religious education of their children, stated:

"The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." 406 U.S. at 215, 92 S.Ct. at 1533.

See also Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); McGowan v. Maryland, 366 U.S. 420, 459, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

As long as parents retain custody and control of their children, the state, in keeping with the mandate of the Establishment Clause that it maintain a position of benevolent neutrality and neither establish nor interfere with the parents' exercise of religion, has neither right nor reason to involve itself in the children's religious upbringing. But when the child is separated from its parents and can no longer be supported, maintained and educated by them, the State of New York has assumed the duty to step into their shoes, at least temporarily, and to provide the essential maintenance and education of the child, see N.Y.Const., Art. XVII, § 1; N.Y. Social Welfare Law § 395, including its moral and religious education, until the parents are once again in a position to assume their lawful and natural role. While the state may not yet be under a constitutional obligation to provide such benefits, see Rothstein v. Wyman, 303 F.Supp. 339, 346–347 (S.D.N.Y.1969), its moral obligation and right to do so cannot be doubted.[18] Having been

---

18. See Note, With the Best of Intentions: The Constitutionality of the Statutory Scheme for Voluntary Child-Care Agencies in New York, 4 N.Y.U.Rev. of Law & Social Change 21 (1974):

"Traditionally, the State of New York has recognized an obligation to provide for children who have been abandoned, who have been turned over to the authorities by parents who are unwilling or unable to

placed in *loco parentis*, the state has no alternative, consistent with its obligation to the public, but to act as the substitute parent of the child. The issue posed by the present case arises out of the fact that the state must wear two hats, one as a surrogate parent obligated to enforce the biological parent's individual rights to provide religious direction and the other as a government obligated to refrain from use of its powers to further or inhibit religion.

■■■■■ A further duty assumed by the state as a surrogate parent is that of fulfilling the child's Free Exercise rights, the existence of which has long been acknowledged. E. g., Prince v. Massachusetts, *supra*, 321 U.S. at 165–166, 64 S.Ct. 438, 88 L.Ed. 645; Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). This, of course, is also accomplished by providing such spiritual and moral training as is appropriate or desired. To deny the child this education, which is necessary for his enjoyment of Free Exercise rights, would represent the very "governmental interference with religion" that is barred by the First Amendment. Walz v. Commissioner, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Hence, a literal reading of the absolute and sweeping language of the Establishment Clause would bar the state from carrying out these essential duties as a substitute parent. Faced with this conflict, our duty is to interpret the two clauses in a sensible and realistic fashion with a view to achieving whatever reconciliation is reasonably consistent with the purpose and intention of the Founding Fathers. Repeatedly the Supreme Court has recognized that the sweeping unqualified language of the Establishment Clause cannot be literally enforced but must be construed to accommodate other fundamental rights. "No perfect or absolute separation [between religion and government] is really possible," Walz v. Commissioner, *supra*, 397 U.S. at 670, 90 S.Ct. at 1412. "The simplistic argument that every form of financial aid to church-sponsored activity violates the Religion Clauses was rejected long ago in Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899)." Tilton v. Richardson, 403 U.S. 672 at 679, 91 S.Ct. 2091 at 2096, 29 L.Ed.2d 790 at 799.

■■■■ Since the Religious Clauses, when in conflict, must be interpreted flexibly so that "there is room for play in the joints productive of a benevolent neutrality," Walz v. Commissioner, *supra*, 397 U.S. at 669, 90 S.Ct. at 1412, we believe that laws which might otherwise be deemed violative of the Establishment Clause may be upheld where they appear reasonably necessary to satisfy Free Exercise rights and do not pose any serious danger to the public. This principle of practical accommodation, in contrast to a strict doctrinaire or unyielding interpretation of the First Amendment's absolute terms, has been adopted in analogous circumstances. Where a state, as the administrator of prisons, military establishments or hospitals needed to protect and preserve public health and safety, has been forced to assume control over and responsibility for inmates or patients entitled to practice their respective religions, "reasonable opportunities must be afforded . . . to exercise the religious freedoms guaranteed by the First and Fourteenth Amendments without fear of penalty." Cruz v. Beto, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). Under such circumstances, the state's employment of chaplains and social workers, where reasonably necessary to permit those in custody to practice their religions, has been recognized as constitutionally permissible, even though the expenditure of such funds for the

care for them, or who have been adjudged by the New York Family Court to be in need of supervision for a variety of reasons, ranging from juvenile delinquency to parental abuse or neglect. The state's obligation to these children has been codified in the laws." (Footnotes omitted)

advancement of religion would be barred by the Establishment Clause in a different setting. Remmers v. Brewer, 361 F.Supp. 537 (S.D. Iowa 1973), affd., 494 F.2d 1277 (8th Cir. April 16, 1974); Theriault v. Carlson, 339 F.Supp. 375 (N.D.Ga.1972); Horn v. People of California, 321 F.Supp. 961 (E.D.Cal.1968). As Justice Brennan observed in Abington School District v. Schempp, 374 U.S. 203, 296, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1962) (concurring opinion):

> "There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain religious liberties also protected by the First Amendment. Provisions for churches and cnaplains at military establishments for those in the armed services may afford one such example. The like provision by state and federal governments for chaplains in penal institutions may afford another example. It is argued that such provisions may be assumed to contravene the Establishment Clause, yet be sustained on constitutional grounds as necessary to secure to the members of the Armed Forces and prisoners those rights of worship guaranteed under the Free Exercise Clause. Since government has deprived such persons of the opportunity to practice their faith at places of their choice, the argument runs, *government may, in order to avoid infringing the free exercise guarantees, provide substitutes where it requires such persons to be.* Such a principle might support, for example, the constitutionality of draft exemptions for ministers and divinity students, cf. *Selective Draft Law Cases* (Arver v. United States), 245 U.S. 366, 389–390, 38 S.Ct. 159, 165, 62 L. Ed. 349; of the excusal of children from school on their respective religious holidays; and of the allowance by government of temporary use of public buildings by religious organizations when their own churches have

become unavailable because of a disaster or emergency." 374 U.S. at 296–298, 83 S.Ct. at 1610–1611 (footnotes omitted).

In a similar vein, Justice Stewart noted:

> "Secondly, the fact is that while in many contexts the Establishment Clause and the Free Exercise Clause fully complement each other, there are areas in which a doctrinaire reading of the Establishment Clause leads to irreconcilable conflict with the Free Exercise Clause.
>
> "A single obvious example should suffice to make the point. Spending federal funds to employ chaplains for the armed forces might be said to violate the Establishment Clause. Yet a lonely soldier stationed at some faraway outpost could surely complain that a government which did *not* provide him the opportunity for pastoral guidance was affirmatively prohibiting the free exercise of his religion. And such examples could readily be multiplied. The short of the matter is simply that the two relevant clauses of the First Amendment cannot accurately be reflected in a sterile metaphor which by its very nature may distort rather than illumine the problems involved in a particular case. Cf. Sherbert v. Verner, post, 374 U.S. p. 398, 83 S.Ct. 1790, 10. L.Ed.2d 965." 374 U.S. at 309, 83 S.Ct. at 1617 (dissenting opinion of Justice Stewart).

Having concluded that an accommodation between the Religious Clauses, when they are in conflict, is constitutionally permissible, we face the remaining question of whether New York's religious placement laws are reasonable and necessary. Turning first to the functioning of these laws, one cannot overlook the long history of valuable community contribution that has been rendered by religiously-affiliated child-care institutions in New York to the housing, health, clothing, feeding and education of foster children, dating back to the 18th century. See Schneider and

Deutsch, The History of Public Welfare in New York State, Univ. of Chicago Press, pp. 5 et seq. (1941). The present statutory plan based on cooperation between state and religious agencies, which began in New York in 1875, see Schneider & Deutsch, *supra*, p. 86, has been tested, debated and modified from time to time, see Fensterstock, History of New York Social Welfare Legislation, Introduction, N.Y. Social Welfare Law, McKinney's Vol. 52A (1966), and has never been shown to be of any harm or prejudice to the public or to the foster children cared for by these institutions. It is not contended that the statutes under attack have been used to favor one or more religion over others or even to favor religion as against the absence of religion. Nor does it appear to be disputed that the payments made over the years to these institutions or agencies, although available for religious purposes, have in fact been used primarily, if not entirely, for the foster children's temporal needs, i. e., food, shelter, clothing, recreation, medical and dental care, transportation, education and vocational training, psychological and psychiatric testing, and professional assessment of a child's social functioning and of the capacity of its family and community to assist in correcting or improving its conduct.

Notwithstanding the enormous social benefits derived by the public from the state's use of religiously-affiliated institutions and agencies to care for foster children, plaintiffs contend simply that because of the pervasively religious atmosphere of these agencies the state has no alternative, consistent with the Establishment Clause, but to place the child in a strictly secular, non-religious home or institution. No suitable or constructive alternative is suggested or offered, however, to fill the void that would be created if the state were to terminate foster care in religious institutions or homes. Although plaintiffs suggest that non-sectarian homes, agencies or institutions be established, no clue is furnished as to where any such existing facilities might be found or how the capital funds for construction and staffing of new facilities might be provided.

Even assuming non-sectarian agencies were located or constructed, new constitutional problems would be encountered. Plaintiffs argue that, if foster children were placed in such homes and agencies, the state could satisfy the religious rights of the children and their parents by arranging, according to each child's religious needs, for the child to attend religious services and obtain religious instruction at an outside church, synagogue or other place of worship. Although this simplistic proposal may appear at first blush to have some merit, further consideration discloses serious problems, due principally to the radically differing needs of the thousands of foster children who are the beneficiaries of state aid. The parents of a child brought up as a Congregationalist, for instance, might be satisfied with a "weekly session" of sunday school followed by a short service, even though the tendency of many Protestant sects has been toward an increase in communal religious activities. But a child raised as a Hassidic Jew would demand a far more pervasive religious upbringing of the type associated with orthodox Judaism, including observance of dietary rules, the Sabbath, attendance at Temple, and continued close affiliation with others of his same religious persuasion. It requires no imagination to appreciate that Quakers, Moslems, Seventh Day Adventists and those of many other religious persuasions would undoubtedly assert perfectly reasonable demands necessitating wide variation in the handling by the state of children of these religions if the state were to satisfy their needs, which far exceed the normal requirements of an adult, since the child, in addition to its participation in the practice of religion, usually receives religious education. In our view, the state, if it were required in each case to be

responsible for such "custom-tailoring" of each child's religious training, determining the extent of a child's participation in communal religious activities of his persuasion and supervising the child's transportation to and custody at such ·activities, would be hopelessly entangled in religion, far beyond its existing simple relationship with foster parents and religious institutions, under which the latter assume all of these responsibilities for the child's religious education.

Such entanglement would itself constitute an establishment of religion. The third part of the Lemon v. Kurtzman tripartite test specifically prohibits any practice that excessively involves the government in religion or religiously based decisions. The situation outlined above would surely exceed any involvement previously held violative of the Constitution. See Committee for Public Education v. Nyquist, *supra*, 413 U.S. at 794–798, 93 S.Ct. 2955; Lemon v. Kurtzman, *supra*. Worse yet, it would not only intimately involve the state in the actual teaching and practice of religion, but would give rise to the continuing public debate and strife over religious issues in government, the evils of which the Supreme Court has repeatedly portrayed. See, e. g., Lemon v. Kurtzman, *supra*, 403 U.S. at 622–624, 91 S.Ct. 2105.

■ For these reasons, we are satisfied that the challenged New York laws represent on their face a fair and reasonable accommodation between the Establishment and Free Exercise Clauses of the Constitution. We leave to further proceedings in this case other questions presented by the pleadings, including the issue of whether or not one or more of these New York constitutional or statutory sections in their implementation deprive plaintiffs of their First Amendment or other federal Constitutional rights.

It is so ordered.