OPINION OF THE COURT
Aileen Haas Schwartz, J.
Movant Rabbi Reuven Simons in his dual capacity as an ordained rabbi and as President of the Emergency Council of Jewish Families seeks leave to intervene as an "interested person” in the subject proceeding under section 392 of the Social Services Law, reviewing the foster care status of the child Roxanne F. The Emergency Council of Jewish Families, as described by movant, "is an organization providing assistance to Jewish children in foster care. The Council, in addition to other assistance, actively seeks foster homes and adoptive parents for Jewish children in foster care, and seeks to assist Jewish prospective foster and adoptive parents in finding Jewish children in foster care.”
Roxanne, who was born in September, 1967, is the child of a father of the black race, Catholic religion, and a mother of the white race, Jewish religion. The child has been in foster care since 1975.
On December 7, 1977, Roxanne’s mother executed a surrender instrument. In conjunction with the surrender, the mother executed a document of "Religious Designation” which states, "It is my wish, if practicable and if consistent with the child’s best interests, that the * * * child be placed in the best available placement without regard to religion.” Guardianship and custody of the child so far as the father’s rights are concerned were also committed to an authorized agency by order of Marks, J., on April 27, 1979 in a proceeding pursuant to section 384-b of the Social Services Law upon the ground of abandonment.
The papers include a certificate of baptism as a Catholic in 1974. Little Flower Children’s Services (hereinafter Little Flower) alleges that the child has received the sacraments of Confirmation and Holy Communion and that "Little Flower considers the child Catholic.” Little Flower and predecessor agencies placed Roxanne in two foster parent homes and *682 additionally two adoptive homes. The child had to be removed from each of the four homes. In November, 1979, when Roxanne was in an institutional setting after removal from the aforesaid second adoptive home, Little Flower authorized a "religious relationship”, the nature of which is disputed, between Rabbi Reuven Simons and Roxanne.
In January, 1980, Roxanne was hospitalized in the adolescent psychiatric pavilion of Long Island Jewish-Hillside Medical Center. Rabbi Simons continued to maintain contact with Roxanne. On March 20, 1980, upon papers that alleged a request by the child to the rabbi to obtain her release from the hospital and to arrange for her adoption by a Jewish family, Roxanne F., through counsel retained by the Emergency Council of Jewish Families to represent Roxanne, applied for an order to show cause seeking said relief against the Commissioner of Social Services of the City of New York (herein after CSS) and Little Flower. That application resulted in an order entered on March 25, 1980, upon consent, directing the filing by the CSS or Little Flower of section 392 of the Social Services Law petition on or before March 27, 1980. The instant petition was so filed. By letter dated March 28, 1980, Little Flower advised Rabbi Simons of the decision "to terminate [his] association with the Jewish children placed at Little Flower”. There was agreement that the child’s release from the hospital would appropriately be sought by habeas corpus proceeding in the Supreme Court. On April 8, 1980, after hearing, the writ and the proceeding thereon were dismissed. Little Flower plans transfer shortly to a residential treatment center with the ultimate plan of adoption. Little Flower states "the agency is continuing to look for an appropriate and the best possible adoptive setting for Roxanne without regard to race, creed or religion.”
Helen Buttenwieser, Esq., was appointed Law Guardian for the child. Counsel retained by the Emergency Council of Jewish Families had sought to represent the child. (See memorandum opinion decision dated April 17, 1980.)
An earlier application for leave to intervene by Rabbi Simons was denied without prejudice to renewal upon proper papers that include a proposed pleading. (CPLR 1014.)
The CSS, Little Flower and the Law Guardian oppose the application. There are no other parties in the proceeding.
Although generalizations are hazardous in areas fraught with ad hoc pronouncements, statutory and decisional guide *683 lines on the subject of intervention as a party and the related subject of "standing” would favor consideration of certain factors, amongst others, in the exercise of judicial discretion regarding permissive intervention: Within the context of the specific action or proceeding before the court, does the applicant have a particular and concrete relationship with the subject of the action or proceeding? Does the action or proceeding involve private or public law litigation? What is the precise nature of the action or proceeding? Is there express statutory or decisional provision for permissive party status? Will intervention impede or otherwise prejudice the other parties’ rights? Can the court afford protection to countervailing interests? Will "party status” foster the factual presentation to the court and so ensure judicial integrity in resolution of the issues sub judice?
Translated to the instant matter: Under all the circumstances, is Rabbi Reuven Simons an "interested person” within the context of the instant proceeding under section 392 of the Social Services Law? Assuming countervailing considerations, can the court protect those interests? Will "party status” impede or illumine factual presentation of the issues for resolution by the court?
Section 392 of the Social Services Law, in core concept, appears a prime example of a legislative mandate for judicial review of executive action. The jurisdiction of foster care status review comprehends the broad subject of the care afforded by the executive to the foster child, including evaluation of plans for the child.[1] Periodic court review in the legislative design serves to ensure vindication of the foster child’s interests. Within the framework of cognate constitutional principles that embody a profound commitment to the *684 sanctity of the family (Wisconsin v Yoder, 406 US 205, 231-233; Stanley v Illinois, 405 US 645, 651; Pierce v Society of Sisters, 268 US 510, 534-535), the determinative substantive standard is the prescribed "best interest of the child.” See, e.g., the preamble to section 384-b of the Social Services Law for the legislative recognition of the primacy of the "obligation” to reunite the family. Notwithstanding the seemingly conventional statutory structure, the "reviewing court” possesses "sui generis” authority: The court is empowered to adjudicate the "best interest” issue de nova, to formulate directives to that end and to monitor implementation of its order. By express provisions, the court possesses "continuing jurisdiction” and is explicitly vested with singular power to effectuate its decision. Indeed, through the medium of section 392 of the Social Services Law, the court shares direct responsibility with the executive and legislative branches in the State’s parens patriae role vis-á-vis the foster child.
The definition in section 392 of the Social Services Law of foster child encompasses the child whose guardianship and custody are committed to the executive and the child whose custody only has been transferred to the executive. As to the child for whom the executive serves as guardian, the executive stands in loco parentis and must assume responsibility to nurture and guide the child in areas reserved beyond debate to the parents as an "enduring American tradition” (Wisconsin v Yoder, supra, p 232), and, indeed, constitutionally protected against State interference in the sanctity of the family. (Wisconsin v Yoder, supra; Moore v East Cleveland, 431 US 494, 499, 503-505.) Suffice it to state for purposes of the limited matter now before the court that the State of New York has included the subject of "religious faith” as a factor in the legislative prescription for foster care and the related area of adoption. (See Social Services Law, art 6, §§ 373, 403; see, also, Wilder v Sugarman, 385 F Supp 1013; Matter of Dickens v Ernesto, 30 NY2d 61, opp dsmd 407 US 917.) Contrasted with the constitutionally protected status afforded the family regarding the subject of religious upbringing (Wisconsin v Yoder, supra; Pierce v Society of Sisters, supra), the subject can hardly be deemed immune from judicial review if the State is the guardian. But compare applicability of the same standards regarding "voluntary” commitment for State institutional mental health care of children by the State as guardian and by a parent (Parham v J. R., 442 US 584; Secretary of Public *685 Welfare v Institutionalized Juveniles, 442 US 640). The CSS recognizes the "religion question” as "one factor going into the determination of the child’s best interests.”
Just as the authority and responsibility of the executive vary in direct correlation with the nature of the legal rights of the executive regarding a given foster child, so, too, does the scope of judicial responsibility reflect the foster care involved in the particular executive-foster child relationship. Additionally, amendments to the initial statutory enactment in 1971 represent a clear legislative intent for an expansive judicial role in safeguarding the best interest of the foster child. To be sure, the reviewing court may not supplant the executive role, but the court must evaluate and ensure proper fulfillment of the executive role vis-á-vis the foster child. To do otherwise would constitute dereliction of the judicial responsibility.
The singular place of the judiciary in the American system enhances the positive duty on the part of the Judge to vouchsafe the integrity of the judicial process. Judges have long been sensitive to a factor that renders the integrity of decision making vulnerable; ofttimes inadequate presentation. Contrasted with civil law systems, the traditional Anglo-American concept of the judiciary does not include an inquisitorial dimension. Rather does the American system rely upon presentation "in an adversary context and in a form historically viewed as capable of judicial resolution.” (Flast v Cohen, 392 US 83, 101.) More than a century and one half ago, that paragon of observers of the American system, Alexis de Tocqueville, in a passage "less familiar” to school boys, perceived the delicate handiwork of the judiciary in fashioning a selective process to ensure presentation in an adversary context. (Sierra Club v Morton, 405 US 727, 740, n 16 [Stewart, J.].)
Divergent views have been voiced regarding limitation of the American Judge at trial to a so-called "umpireal” role. (Frankel, The Search for Truth—An Umpireal View, 30 Record of Assn. of Bar of City of New York 14.) Few, if any, however, would challenge judicial consideration of the effect upon the quality of the presentation of issues at the trial in evaluating pretrial applications, including the subject request for leave to intervene or related matters. The now classic query regarding the related subject of "standing” in Baker v Carr (369 US 186, 204) serves as "instructive analogy”: "Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which *686 sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?” A proper consideration, albeit not necessarily a decisive factor, in evaluating an application for leave to intervene is whether intervention will result in illumination of the issues presented for resolution by the court. As the Court of Appeals emphasized in reversing limitation of leave to intervene in a CPLR article 78 proceeding, in Matter of Martin v Ronan (47 NY2d 486, 491-492): "Failure to grant so much of appellants’ motion to intervene as would have permitted their participation in a de nova consideration of the merits therefore foreclosed a critical factual perspective from emerging”.
The formula in subdivision 4 of section 392 of the Social Services Law of party status for enumerated categories with discretion conferred upon the court to include "such other person as the court may, in its discretion, direct” envisages judicial cognizance of the varied dimensions inherent in the very nature of foster child status. Indeed, the unequivocal thrust of the legislative provision is participation with party status by persons whose distinct and concrete interests regarding the child will ensure enlightening presentation of the specific issues for resolution in the particular section 392 proceeding. Nor is such party status affected because the interest is legally "derivative” from the child’s constitutional or statutory rights. See, e.g., as to foster parents Smith v Organization of Foster Families (431 US 816).
So, too, with the CSS’s argument that the role of the Law Guardian forecloses party status for the applicant ("In arriving at a recommendation for the court, Roxanne’s Law Guardian will presumably consider the religion question in its proper place — one factor going into the determination of the child’s best interests.”) That same reasoning was rejected by the Supreme Court in Smith v Organization of Foster Families (supra, p 841, n 44):
"Appellants argue * * * that in any event appellee foster parents have no standing to rely upon a supposed right of the foster children to avoid 'grievous loss,’ because the foster children are independently represented by court-appointed counsel, who has consistently opposed the relief requested by appellees, and denied that the children have any such right.
"This argument misunderstands the peculiar circumstances of this lawsuit. Ordinarily, it is true, a party would not have standing to assert the rights of another, himself a party in the *687 litigation; the third party himself can decide how best to protect his interests. But children usually lack the capacity to make that sort of decision, and thus their interest is ordinarily represented in litigation by parents or guardians. In this case, however, the State, the natural parents, and the foster parents, all of whom share some portion of the responsibility for guardianship of the child * * * are parties, and all contend that the position they advocate is most in accord with the rights and interests of the children. In this situation, the District Court properly appointed independent counsel to represent the children, so that the court could have the benefit of an independent advocate for the welfare of the children, unprejudiced by the possibly conflicting interests and desires of the other parties. It does not follow, however, that that independent counsel, who is not a guardian ad litem of the children, is solely authorized to determine the children’s best interest.”
Consistent with the nature of the proceeding and the extraordinary judicial responsibility, the well-established practice of the Family Court is to afford party status liberally in a proceeding under section 392 of the Social Services Law. That policy comports with the decisional and statutory expansion of the "interested person” concept and the "standing”[2] doctine in proceedings challenging governmental action. (See, e.g., Duke Power Co. v Carolina Environmental Study Group, 438 US 59; United States v SCRAP, 412 US 669; Flast v Cohen, 392 US 83, supra; Baker v Carr, 369 US 186, supra; but cf. Schlesinger v Reservists to Stop the War, 418 US 208; United States v Richardson, 418 US 166; Sierra Club v Morton, 405 US 727, supra; see as to development of New York law Matter of Martin v Ronan, 47 NY2d 486, supra; Wein v Comptroller of State of N. Y., 46 NY2d 394; Boryszewski v Brydges, 37 NY2d 361, "departing” from St. Clair v Yonkers Raceway, 13 NY2d 72; Matter of Douglaston Civic Assn. v Galvin, 36 NY2d 1; Matter of Burke v Sugarman, 35 NY2d 39; CPLR 1013, 7802; 3 Carmody-Wait 2d, NY Prac, § 19:135 et seq.; 21 Carmody-Wait 2d, NY Prac, § 128:1 et seq.; 24 Carmody-Wait 2d, NY Prac, § 145:289 et seq.; § 147:28; 2 Weinstein-Korn-Miller, NY Civ Prac, par 1013.01; 8 Weinstein-Korn-Miller, NY Civ Prac, par 7802.04.) The "interested person” concept and the "standing” doctrine in proceedings involving governmental action *688 prove singularly apposite to the subject of "interested person” in the instant proceeding under section 392 of the Social Services Law as distinguished from the broader area of intervention in private law litigation.
The liberalizing philosophy that "generally standing should be expanded rather than contracted” (Matter of Burke v Sugarman, supra, p 45), does not represent insensitivity to countervailing considerations. See particularly, concurring opinion of Powell, J., in United States v Richardson (supra, at p 180). Nor do the cases manifest abdication from the traditional judicial concern and concomitant formulation of standards to minimize prejudice to those countervailing interests. Thus, for example, New York State decisional precedents ensure that party status does not automatically confer the same discovery rights regarding access to confidential information to all parties alike in a section 392 proceeding. (Matter of Louis F., 42 NY2d 260; Matter of Carla L., 45 AD2d 375.) Matter of Louis F. (supra) and Matter of Carla L. (supra) should serve to alleviate the Law Guardian’s apprehension that permissive party status signals an end to privacy.
Rabbi Simon’s "religious relationship” and consequential views and averments regarding the rights of the child involve significant components of the foster care and plans sub judice. It is noted that in the instant circumstances, there will be no parent as party, no foster parent as party and no adoptive parent as party in Roxanne’s case. Further, although more than 24 months have elapsed since the last section 392 proceeding, and section 392 of the Social Services Law requires review after that period, the present petition is the product of Rabbi Simon’s initial application on behalf of Roxanne.
Those who oppose party status for the applicant upon the argument that there is no real controversy for judicial inquiry but rather agreement that only one decision can be reached, "Foster care continued. Agency to plan for adoption”, would relegate the section 392 court to a perfunctory role.[3] The court must know the facts in order to fulfill its duty to the child. (Cf. Cardozo, J., United States v Chicago, M., St. P. & P. R. Co., 294 US 499, 511.) Denial of the application may well deprive the court of the illuminating presentation of issues essential for resolution in the best interests of the child.
*689 Under all the circumstances, particularly the authorized "religious relationship” with Roxanne, Rabbi Reuven Simons in his capacity as an ordained rabbi is deemed an interested person within the context of section 392 of the Social Services Law. However, that part of the application that seeks party status for the rabbi in his capacity as president of the Emergency Council of Jewish Families is denied. The instant judicial proceeding is hardly the proper forum for "generalized grievances” (Flast v Cohen, 392 US 83, 106, supra) or "abstract questions” (Schlesinger v Reservists to Stop the War, 418 US 208, 223).
Determination of party status is not and should not be construed as approbation of the underlying relationship or the views espoused by the applicant. Moreover, should circumstances so indicate, there may be further application to the hearing court. At this stage, the function of the court is to ensure the proper presentation of issues, not their resolution.

. Subdivision 7 of section 392 of the Social Services Law provides: "At the conclusion of such hearing, the court shall, upon the proof adduced, in accordance with the best interest of the child, enter an order of disposition:
"(a) directing that foster care of the child be continued; or
"(b) ** * * directing that the child be returned to the parent, guardian or relative; or
"(c) * * * directing [the] agency * * * to institute a proceeding, pursuant to section three hundred eighty-four-b of this chapter, to legally free such child for adoption * * *
"(d) in the case of a child whose guardianship and custody have been committed to an authorized agency by an order of a surrogate or judge of the family court or by a surrender instrument, directing that such child be placed for adoption in the foster family home where he resides or has resided or with any other person or persons.”

. See as to jurisdiction, justiciability and standing, Flast v Cohen (392 US 83, 94-102, supra); Baker v Carr (369 US 186, 198-237, supra).

. See Smith v Organization of Foster Families (431 US 816, 835, n 36), "[C]ritics of foster care have argued that given the heavy caseloads, such review may often be perfunctory.”